Keating, J.
Frank and Margit Sugar arrived in the United States in December, 1956 after having made their way to safety in the West following the collapse' of the Hungarian Revolution. In 1960 they began operating a small, retail clothing shop in Manhattan.
Late in the afternoon of Wednesday, April 29, 1964, Frank and Margit were sitting at a desk toward the rear of their store. The store was quiet. Three teen-agers entered the store, moved toward the back, asking “ Where’s the 40 suits?” His suspicions aroused, Mr. Sugar quietly told his wife to walk toward the door. “ Something is wrong,” he whispered to her. As they approached the door, Mr. Sugar in front, his wife behind, the door opened again and three more boys came in. They pushed Mr. Sugar back and began attacking him and his wife with knives. He heard his wife cry out: “ Somebody kill me.” Mr. Sugar turned. Seeing his wife falling to the floor, he ran *315 to help her. He dragged her to the wall and propped her up against it. Margit’s clothing was stained with blood; she was pale and silent. As Mr. Sugar knelt beside his wife, one of the six boys came at him with a knife. Mr. Sugar was able to knock the knife out of the attacker’s hand, and it dropped to the floor.
The six fled. Mr. Sugar ran next door to a drugstore to get help. He then ran back to the shop to his wife’s side. Moments later, the police and ambulance arrived. Margit was fatally wounded. Mr. Sugar had received seven severe knife wounds. An emergency operation, however, saved his life.
The police started their investigation. Robert Barnes, then age 18, was brought in for questioning. On the morning of the 30th, he was questioned by Detective Gonzales. The interrogation was not fruitful, and Barnes was placed in the precinct’s “ bullpen ” with nine others. After about two hours had passed, Barnes mentioned to one of his cellmates that the police did not know who committed the murder and ‘ ‘ would probably never find out.” A half hour later Detective Gonzales called Barnes out of the prison pen and repeated to Barnes the words of his earlier conversation. Confronted with this incriminating statement, Barnes then made a full confession, and all the details of this brutal murder became known.
A little more than an hour before the murder, Barnes met the defendant Thomas, nicknamed ‘ ‘ Turk ’ ’, and together they went to meet defendants Baker, Craig, Hamm and Rice. Barnes knew them all as they had seen each other as a group quite often.
The boys went into a hallway of a building where they, with defendant Baker taking the lead, began to plan a robbery of a clothing store. Barnes recognized the store from Baker’s description of it. Around this time the sixth defendant Felder joined the group. As Baker outlined his plan, Barnes, Craig and Thomas would walk into the store first and Thomas would ask for a size 40 short suit. Five seconds later, Baker and Rice would walk into the store. The storeowner and his wife would be “ doused ”. Baker would stab the man and Rice the woman. In the meantime the first three would be filling shopping bags with suits. Felder would follow Baker and Rice into the store, close the door and pull down the shades. All six would now fill the shopping bags so that there would be “ a shopping bag *316 apiece ”. While Baker was talking, Barnes noticed that both Baker and Bice were carrying knives.
After the first conversation, the group then went to Thomas’ house where they sat in the kitchen while, this time, Bice went over the details of the plan. Hamm, who refused to go into the store, was to act as a lookout and would check out the store to see if there were any customers inside. It was agreed that, after the crime, they would all meet at Bice’s house. Because Barnes was the fastest runner, he was given the key to Bice’s apartment. He would leave the door open for the others. The plan agreed upon, the seven left Thomas’ apartment and set out to carry out the robbery and the double murder.
The time was now about 4:50 p.m. At this point, one of those strange coincidences which so often attend these crimes occurred. On their way to the store, they passed Barnes ’ home. Barnes’ father saw him and called him inside to discuss with the landlady an argument which Barnes had had that morning with the superintendent. This discussion lasted until about 5:30 p.m. when his father let him go on his way. He headed for Bice’s house to return the key and to get his share of the loot to which he still felt entitled. His path took him past the store. He saw police outside and, when he looked in, he saw two puddles of blood on the floor. Bice lived some two blocks away. When Barnes arrived he found Baker, Craig, Bice and Thomas. They sat in the living room and talked, while Bice’s grandmother was working in the kitchen.
Bice told Barnes that there was no loot to split as they had rpn out of the store. Felder and Hamm had been at the apartment but had already left, apparently intending to flee. Bice demonstrated how he had stabbed the woman. After some further talk, the boys left, departing two by two to avoid arousing suspicion.
Defendants were thereafter arrested. At a joint trial all six of the defendants were found guilty of first degree murder, attempted murder in the first degree and attempted robbery in the first degree. They were each sentenced to life imprisonment, 12% to 25 years, and 7% to 15 years on each of the charges respectively, the sentences to run concurrently. The Appellate Division unanimously affirmed the convictions of all of the *317 defendants, with the exception of defendant Baker whose conviction was affirmed by a closely divided court (28 A D 2d 24).
Defendants stand convicted of a particularly vicious crime. That there is ample evidence to establish the guilt of all six beyond a reasonable doubt (only three even bother to raise this issue) is clear from the record. We are, however, constrained by principle and precedent to reverse the judgments below and order new trials as to all of the defendants because of errors committed at the trial, which deprived the defendants of a fair trial and resulted in a constitutionally defective trial.
The prime error which compels a reversal and a new trial as to all the defendants is the implication of the defendants in the crime by the confessions and statements of some of their codefendants.
During questioning by the prosecutor, Barnes and Detective Gronzales testified that some of the defendants made statements inculpating their codefendants. Thus, on one occasion, the detective implicated-—via defendant Hamm—each of the other defendants at least twice. Another instance occurred somewhat earlier in the trial during the testimony of Barnes when Barnes implicated Felder through statements made by Bice and Thomas. However, neither Hamm, nor Bice nor Thomas testified. Other examples of this improper admission of statements by nontestifying defendants are to be found in the record. The admission of these statements without any attempt to redact them violated the defendants’ constitutional right to confront their accusers (Bruton v. United States, 391 U. S. 123, 134, n. 10).
The error cannot be ignored upon the ground that no proper objection was made (see O’Connor v. Ohio, 385 U. S. 92) since in this pre-Bruton case their admission under limiting instructions was proper. (People v. Vitagliano, 15 N Y 2d 360; see Roberts v. Russell, 392 U. S. 293 [holding Bruton retroactive].) Nor can the error be disregarded as nonprejudicial. (See People v. Boone, 22 N Y 2d 476; People v. Adams, 21 N Y 2d 397.) While it is true that the need to avoid testimony in violation of Bruton offers difficulties for the trial court, not present when it is dealing with written statements, the matter here in question cannot be *318 put aside as minor or inadvertent where Detective Gonzales’ testimony was given in order to bolster Barnes after a thorough cross-examination.
To compound the problem, the prosecutor urged the jury to consider Hamm’s statement against all the defendants. This vitiated any instructions by the trial court (People v. Adams, 21 N Y 2d 397, 401; People v. Lombard, 4 A D 2d 666). Not only did the trial court not warn the jury against the impropriety of this line of argument, in effect it overruled the objection. Other improper use of the confessions and oral statements appears throughout the summation.
There is also presented the question of the adequacy of the redaction of the written statements obtained from defendants Baker, Hamm and Rice. Although X’s were substituted in Baker’s and Hamm’s question and answer statements,' and in Rice’s confession, each of the admissions went into great detail and each parallels Barnes’ account of the crime. From this and Hamm’s oral statement, it was a simple matter for the jury to substitute for the “ X’s ” the names of the appropriate defendants. None of these statements or confessions were and none can be effectively redacted. (People v. Jackson, 22 N Y 2d 446; People v. Burrelle, 21 N Y 2d 265; People v. La Belle, 18 N Y 2d 405; see, also, United States v. Bozza, 365 F. 2d 206, 215, quoted in Bruton, 391 U. S., p. 130, n. 4).
These errors compel a new trial for the three confessing defendants as well as for the nonconfessing defendants (People v. Burrelle, supra). It might well have been the existence of the other confessions which led the jury to conclude that each of the confessions was both truthful and voluntary and the defendants’ guilt proven.
We turn then to the only other error which mandates a reversal here, albeit with respect to the defendant Baker only. Baker’s confession was obtained after he had been surrendered to the police by his attorney for the purposes of arraignment. It is uncontroverted that the attorney had made it clear that he wished his client to make no statement and to be present at any questioning of his client. The statements taken by the police and the Assistant District Attorney after Baker’s attorney had left the police station were, therefore, inadmissible *319 (People v. Di Biasi, 7 N Y 2d 544; People v. Gunner, 15 N Y 2d 226; People v. Arthur, 22 N Y 2d 325).
Defendants Hamm and Rice also argue that their confessions should have been excluded. It is their contention that the police and the Assistant District Attorney had denied their attorneys access to them in violation of their constitutional rights (People v. Donovan, 13 N Y 2d 148). The trial court made findings of fact which in effect found that defendants’ constitutional rights were not violated. These findings were affirmed by the Appellate Division. The limited nature of this court’s jurisdiction to review affirmed findings of fact requires us to accept these findings since they have not been shown to be incredible as a matter of law. The other arguments made by Hamm and Rice with respect to their confessions ask us to apply post-Miranda standards to this pre-Miranda interrogation. In New York, Miranda has not been applied retroactively. (People v. McQueen, 18 N Y 2d 337.)
We come then to the question whether the seizure of certain evidence admitted at the trial violated the Fourth Amendment to the Constitution and should not have been received. It will be recalled that Barnes, in his account of the crime to the police, related that Rice had given a demonstration of the ‘ ‘ dousing ’ ’ with a bloodstained knife. At the shop, the police had found one knife and based on Barnes’ account a warrant to search Rice’s home for the second knife was procured. A detective went to execute the warrant. He was admitted to the apartment'by Rice’s grandmother. In Rice’s bedroom he did not find the knife, but he did notice a beige cardigan sweater or jacket with knit sleeves and a suede front. The detective remembered that Mr. Sugar had mentioned that the boy who had attacked him had worn such a sweater. The sweater was seized and, upon‘Mr. Sugar’s testimony that it was the sweater worn by his attacker, it was received in evidence, but solely against Rice.
It is argued that the sweater was not described in the warrant and its seizure was unauthorized. In our judgment this contention is correct.
In Marron v. United States (275 U. S. 192) the police had obtained a warrant for liquor but, during the course of their *320 search, they discovered books and records concerning the operation of an illegal liquor enterprise. In holding the seizure illegal, the Supreme Court said (275 U. S., p. 196): “ The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant.”
There can be no question that, had the officer returned, he could have obtained a warrant to seize the sweater, since, combined with the information Mr. Sugar had given him, his personal observations, while lawfully in the apartment, would have authorized the issuance of a warrant for the seizure of the sweater (Warden v. Hayden, 387 U. S. 294 [holding that the seizure of ‘e mere evidence ’ ’ is proper during the course of a valid search for a suspect]).
The People argue that the Supreme Court’s overruling of the “mere evidence” rule supports the seizure of the jacket here. This is not so. If anything, it reinforces the strength and need for the Marrón holding.
Hayden did not involve a search warrant, and at no point was Marrón discussed by the court. Moreover, Marrón was cited with approval in Berger v. New York (388 U. S. 41, 58), decided after Hayden (see, also, Stanford v. Texas, 379 U. S. 476). Also in Hayden, the court’s opinion makes it quite clear that there the basis of its conclusion was that, since the exigencies of the situation justified the police in entering the house without a warrant in search of a suspected armed felon and, as probable cause existed, there was no reason to distinguish between an intrusion to secure mere evidence as distinguished from fruits, instrumentalities, or contraband, which was clearly authorized (Harris v. United States, 331 U. S, 145).
Here, however, the authorization for the intrusion was very narrow and circumspect—for a weapon used during the commission of a crime — and there were no exigent circumstances requiring an immediate response. To permit the seizure of unauthorized items in the course of a lawful search would eliminate the constitutional requirement of “ particularity ” and would open the door for general searches abhorred since *321 colonial days and banned by both the Federal and State Constitutions. The right to search for and seize one item does not permit the inference that there is probable cause for other items. More important, now that seizure of £ 6 mere evidence ’ ’ is authorized, courts will have to be more diligent in assuring that an authorized search for a particular item is not used as a device to gain access for general exploratory searches for evidence, thereby destroying the people’s security in their persons, houses, papers, and effects, guaranteed by the Fourth Amendment.
In People v. Cefaro (21 N Y 2d 252), a search warrant was issued to search for narcotics and narcotic instruments. After the instruments were found, however, the police continued searching and discovered a stolen camera in a child’s bureau. While the issue in that case involved a question of standing, we clearly stated that the camera would not have been admissible against the owner of the apartment. This was in accord with Marron v. United States (supra).
In United States ex rel. Pickens v. La Vallee (391 F. 2d 123 [2d Cir., 1968]) an order was affirmed discharging the relator from parole unless the State promptly retried him. Defendant was convicted of burglary in the third degree and of possession of burglar’s tools. The facts are identical to the case at bar. Having obtained a search warrant to search defendant’s apartment for “key-making machines, blank keys, lock picks ”, the police searched the apartment.
Among the items seized were newspaper clippings of several burglaries. The articles were not used on the People’s direct case, but for purposes of cross-examination. The newspaper articles clearly were not within the ambit of the warrant. After discussing whether the question was de minimis, the court went on to hold that the seizure could not be sustained on the authority of Warden v. Hayden (supra). As here, the defendant was under arrest and there was no claim that there was no time and opportunity to obtain a warrant. Two cases, cited by the People, United States v. Eisner (297 F. 2d 595) and Johnson v. United States (293 F. 2d 539) look the other way. Both, however, do not involve “ mere evidence ”, but stolen property. The Supreme Court’s recent affirmation of Marrón indicates *322 that these cases cannot be considered authoritative in a case involving “ mere evidence ”.[1]
Up to this point, we have been concerned solely with constitutional questions, but defendants have also raised several nonconstitutional points requiring some discussion. For example, two evidence questions must be considered. The first is an issue of alleged improper bolstering of a witness. After cross-examination, Barnes was permitted to testify that he had given the same account to Detective Gonzales when called out of the “bullpen” shortly after his incriminating admission to a narcotics addict. Later, Gonzales testified to this original conversation. It is claimed that this testimony constituted improper bolstering. (Crawford v. Nilan, 289 N. Y. 444; People v. Caseria, 19 N Y 2d 18.)
The People urge that this testimony is admissible under the recent fabrication rule. (People v. Katz, 209 N. Y. 311, 336-344; Ferris v. Sterling, 214 N. Y. 249; People v. Singer, 300 N. Y. 120; People v. Coffey, 11 N Y 2d 142.) It is argued that various motives to falsify were ascribed to Barnes and some of these motives could have arisen only after Barnes made his original admission to Gonzales. They include the obtaining of material witness fees, with which Barnes could satisfy his craving for clothing, consideration for other charges pending against him, the free food the witness occasionally received from the police force, and, most of all, the fact that he had not been indicted.
No doubt Barnes’ principal motive to falsify arose from his desire to cast blame on others and that this motive existed from the moment he was confronted with his inculpating statement. Yet it is equally true that Barnes was bitterly attacked for motives which could only have arisen after his initial conversation with Gonzales. This justified the rehabilitation.
*323 In People v. Caserta (supra) this court made it clear that the People could not escape the limitations of the recent fabrication rule by relying on some minor point of cross-examination to justify the introduction of prior consistent statements. Nevertheless, were we to accept the defendants’ argument, an accomplice’s testimony could almost never be rehabilitated — no matter what the nature of the attack on his testimony—since the desire to save one’s self from punishment would normally be the predominant motive for perjury of any accomplice (People v. Katz, supra, p. 338). Yet, as here, other motives may be urged by the defendants as the reason for false swearing. Thus, here, a good portion of the attack on Barnes was based on events arising subsequent to the initial confrontation with Gonzales. Therefore, it was not error for the court to admit the testimony of Barnes on redirect and of Gonzales.
Before concluding on this point, a brief discussion of the effect of Bruton for the recent fabrication rule is necessary. Gonzales and Barnes, on redirect, did not just make the statement that the testimony given by Barnes on direct was to the same effect as the admission made by Barnes outside the “ bullpen ”. Instead, it was described in complete detail including all the statements made by the other defendants which would otherwise be inadmissible on Barnes’ direct testimony in a joint trial. We think it clear that prior consistent statements may be used only where they do not raise the possibility of violating Bruton. The risk of prejudice is great, and the probative value of this bolstering testimony is limited. This exception to the hearsay rule must yield to the constitutional right to confront one’s accusers.
The second evidentiary issue involves the admissibility of a witness’s testimony before the Grand Jury concerning her photographic identification of defendant Felder. The witness, Barbara Wright, was in the drugstore at the time of the murder and identified Felder as one of the persons she saw running away from the murder scene. In addition, she was permitted to testify that she had identified a photograph of Felder before the Grand Jury. It is of course settled that a witness may not testify that she previously made a photographic identification of the defendant (People v. Cioffi, 1 N Y 2d 70, 73; People v. Hagedorny, 272 App. Div. 830; see Wall, *324 Eye-Witness Identification in Criminal Cases, pp. 165-171). One exception to the rule is where a claim of recent fabrication is made (People v. Coffey, 11 N Y 2d 142, supra). That exception is inapplicable here.
The People argue that no photographic identification was made since the photograph was to assist the jury in connecting the defendant held on the charge with the person named by the witness. A reading of the record indicates that the witness was able to identify the defendants only after examining the photographs. Otherwise, she was unable to describe or identify the defendants.
Nevertheless, the testimony was admissible on another basis. On cross-examination, it was brought out that Barbara had testified before the Grand Jury that she did not recognize some of the boys that she saw running around the corner. On redirect', the People sought to correct this impression that Barbara had not recognized the boys. A party may always read another pertinent portion of a statement used for the purposes of impeachment to correct a false impression that reading only a part of the statement may give. (See CPLR 3117, subd. [b].) Thus the statement here was admissible for purposes of showing that there was in fact no contradiction. Our conclusion, therefore, is that the reading of Barbara Wright’s testimony of her photographic identification to the jury was not error.
Various claims of error concerning the trial court’s charge are also made. Comment need only be made about two points. It is claimed the trial court erroneously refused to charge the jury that the absence of Miranda warnings should be considered by the jury on the question of voluntariness of the confessions or admissions.[2]
In People v. Horton (18 N Y 2d 355) this court held it was error for the Judge at a Huntley hearing to refuse to admit evidence relating to pre-confession warnings (cf. People v. Hocking, 15 N Y 2d 973; People v. Taylor, 16 N Y 2d 1038). Under the circumstances, however, we found it ‘ ‘ inconceivable that any prejudice could have resulted to the accused ” (id., p. *325 361). As there is no evidence that defendants Hamm or Bice were ever informed of their rights by the police, the jury should have been charged on this point. This is especially so where the trial court charged the jury at the request of the prosecution that there was no legal requirement that such warnings had to be given. This latter statement was, of course, correct (People v. Simons, 22 N Y 2d 533) except that both statements would make for a more balanced charge on voluntariness.
The second point with respect to the trial court’s charge involves defendant Felder’s argument that the court should have itemized the pieces of evidence which could be considered by the jury as corroborative of Barnes’ testimony that Felder had participated in the crime. No request to so charge was made and Felder is, therefore, precluded from raising the point for review. Nevertheless, since there is to be a new trial, better practice would suggest that this course be followed by the trial court, if the defendants are tried jointly, to avoid any possibility of prejudice, although it is clear that there is no absolute requirement that this be done (People v. Horton, 19 A D 2d 80, 85-86, affd. 18 N Y 2d 355, supra).
Finally, we find no error in the manner in which the trial court appointed defendants’ counsel. As to the remaining claims of error, they are not of sufficient merit to require further discussion.
Accordingly, the judgments of conviction should be reversed and new trials ordered for all of the defendants.

. In light of this conclusion, there are two issues with which it is not necessary for us to deal. There is first the question whether the sweater should be held inadmissible on account of the failure of the police to make a timely return (Code Crim. Pro., § 802). The second issue arose in the following manner. During his summation, the prosecutor argued that the sweater confirmed Baker’s participation in the crime. This clearly was improper as there was no evidence that the sweater found in Rice’s home belonged to Baker. Whether this argument constituted prejudicial error is an issue we need not reach.

. The request was made on behalf of defendant Baker and, as Baker’s confession is to be excluded, technically the issue is moot. However, the issue may arise again with respect to the other two confessions.