The **PEOPLE OF the STATE OF NEW YORK**, Respondent,

v.

Wallace **BAKER** et al., Defendants-Petitioners.

No. 72 Civ. 3926.

United States District Court, S. D. New York.

Jan. 26, 1973.

Frank S. Hogan, District Attorney, New York County, by Robert J. Lehner, Asst. Dist. Atty., New York City, for respondent.

Lewis Steel, New York City, for Baker.

Conrad J. Lynn, New York City, for Craig.

Edward Leopold, Brooklyn, for Felder.

William M. Kunstler, New York City, for Thomas.

## MEMORANDUM

BRIEANT, District Judge.

By a hybrid proceeding, filed September 14, 1972, and appearing on this Court's civil docket, Relators-Petitioners-Plaintiffs, Wallace Baker, *et al.*, four young Black men, who have submerged their individual identities and become known as the "Harlem Four", make a threefold attack on the jurisdiction and power of the District Attorney of New York County [1] to bring to trial an indictment against them filed in the Spring of 1964.

Relators-Petitioners-Plaintiffs (hereinafter for convenience, "Petitioners") seek (a) a writ of habeas corpus discharging them from state custody pursuant to 28 U.S.C. § 2254, or alternatively, (b) removal of the state criminal charges against them for trial in this Court, pursuant to 28 U.S.C. § 1443(1) et seq., or alternatively, (c) a permanent injunction of the state prosecution, to be issued pursuant to 42 U.S.C. §§ 1981 and 1983 and 28 U.S.C. § 1343.

Respondent, by order to show cause returnable November 29, 1972, seeks to remand the criminal charges to the Supreme Court of the State of New York pursuant to 28 U.S.C. § 1447(c).

Petitioners are residents and citizens of the State of New York and of the United States. Jurisdiction exists with respect to all three aspects of the petitioners' claims.

Petitioners and two others were charged with the felony-murder at 5:00 P.M. on April 29, 1964 of Mrs. Margit Sugar, and the stabbing of her husband Frank Sugar, incident to a robbery of their second-hand clothing store, the "Eve and Pete", located at 1–3 West 125th Street, in the area of New York City known as Harlem.

Petitioners and the two others, Hamm and Rice, were convicted after a joint jury trial, on July 17, 1965, and sentenced to life imprisonment on the murder charge, and given lesser sentences on attempted murder and attempted robbery. After their convictions were affirmed by the Appellate Division, First Department (28 A.D.2d 24, 281 N.Y.S.2d 161, decided June 22, 1967) the *Bruton* rule was developed by the Supreme Court of the United States (Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476, decided May 20, 1968), and made retroactive (Roberts v. Russell, 392 U.S. 293, 88 S.Ct. 1921, 20 L.Ed.2d 1100, decided June 10, 1968).

On November 27, 1968 (People v. Baker, 23 N.Y.2d 307, 296 N.Y.S.2d 745, 244 N.E.2d 232), the New York Court of Appeals reversed the convictions because of *Bruton*, and also for other reasons unrelated to guilt or innocence. Confessions of Hamm and Rice, implicating these defendants had been received in evidence at the trial. Since that time, Hamm pleaded guilty to reduced charges based on the same facts, and Rice was tried separately and convicted. Each of these is now appealing his conviction in state courts.

These four petitioners were retried in 1971 before Mr. Justice Backer and a jury. The jury deadlocked and a mistrial was declared.

They were tried again, commencing November 8, 1971, and concluding January 27, 1972, before Mr. Justice Martinis of the New York Supreme Court, and a jury. This jury also failed to agree on a verdict and because of deadlock was discharged by the Court, and a mistrial declared.

■ Petitioners, after having been imprisoned for approximately eight

---

1. Although the People of the State of New York are listed as respondent herein, the action is not in fact an action against the State. Actually, relief is sought only against the District Attorney of New York County.

years, urge that they are presently attempting, successfully, to restructure their lives and become useful citizens. If so, this is not relevant to the issues presently before this Court.[2]

We are told that the last jury was divided seven to five for acquittal. The total vote of the various jurors at the various trials, however, cannot be considered relevant to the issues before us, as a deadlock produces a mistrial whether six to six, or eleven to one.

On February 14, 1972, petitioners moved in the New York Supreme Court to dismiss the indictment on various grounds, including the claim that their constitutional rights would be violated by a further (fourth) trial. This motion was denied after an evidentiary hearing by an opinion and decision made June 27, 1972 by Mr. Justice Martinis.

No procedure exists in New York for intermediate appellate review of such a decision, although it may be reviewed in an appeal from a final judgment of conviction after retrial before another jury. Because petitioners are presently free on bail, they lack standing to maintain a state habeas corpus proceeding. New York does not recognize bail status pending trial as constructive detention in satisfaction of that jurisdictional requirement for habeas corpus. CPLR § 7002(a); People, etc., ex rel. Modica v. Hoy, Sheriff of the County of Westchester, 51 Misc.2d 579, 273 N.Y.S.2d 634 (Hoyt, J., 1966).

▉ Accordingly, petitioners have exhausted their state remedies, and may not test further, except in this Court, their Constitutional claim that they may not be retried.

Mr. and Mrs. Sugar, victims of this brutal crime, were White, although they may hardly be characterized as exploiters in any racist tradition; they were poor Hungarian refugees, who had fled to the United States in 1956, operating a marginal second-hand clothes store.[3]

Viewing the evidence most favorably to the prosecutor, as we must, defendants agreed in advance to enter the store in a group, to douse (i. e. kill, see 23 N.Y.2d 315, 296 N.Y.S.2d 745, 244 N.E.2d 232) Mr. and Mrs. Sugar with knives, and to make off with clothing in their own shopping bags, which they had brought for the purpose.

In order to bring themselves within the provisions of 42 U.S.C. § 1981, petitioners make the following allegation:

> (¶ 11) "Upon information and belief, the sole and exclusive reason why defendant Hogan is insisting that he will prosecute relators for the fourth time is that they are Black men who are accused of murdering a White woman, a stereotype etched deeply into the psyche of White America."

▉ Assuming that this brutal crime conforms to any stereotype, which may seem doubtful, petitioners attack the ex-

2. As Mr. Justice Martinis observed, correctly, 70 Misc.2d 986, 335 N.Y.S.2d 487, in his June 27, 1972 decision:

"All of this is most commendable and a tribute to the respective defendants as well as the penal institutions that offered them the opportunity to explore their talents. While these factors are most salutary, and however much this court desires to extend its consideration to these remarkable attainments, there is no law or precedent that gives the court the power to absolve them from the serious charges that stand unresolved and unadjudicated.

While all these factors most certainly would deserve serious consideration by a sentencing judge, a parole board, or by the Governor of this State, upon an application for a pardon, they are not pertinent on the issues now before this court."

3. Although petitioners here would evoke a racist stereotype, argument was made to the trial jury that there was no "vendetta against the Sugars", or any "feeling against them" in the neighborhood, racially motivated or otherwise. See pp. 5233–35.

Accordingly, it may be seen that the *crime* was not "political". The trial record negates any suggestion that the charges, as distinguished from the crime, were in fact political.

ercise by the District Attorney of New York County of prosecutorial discretion to try the defendants for a fourth time (a third time, if the first conviction be excluded). In essence, they ask this Court to review the prosecutor's exercise of his discretion, or alternatively, to hold either as a matter of law, or on the facts, the abuse of discretion by the prosecutor in bringing the Harlem Four to trial for a fourth (actually, third) time is so egregious as to constitute a denial of due process, or double jeopardy in violation of the Fifth Amendment to the Constitution.[4]

This Court has reviewed the entire transcript of the last trial before Mr. Justice Martinis.[5]

4. We deal with the double jeopardy claim *infra*, p. 169, et seq. Insofar as the exercise of discretion by a New York District Attorney is concerned, unless in doing so he violates the constitutional rights of a party, his discretion is not subject to the control of any court. As stated by Mr. Justice Dempsey (Sup. Ct., Westchester Cnty.) in the recent case of Johnson v. Vergari, Index No. 72/15535, decided January 4, 1973, and not yet officially reported:

"The District Attorney is a constitutional officer. A failure to perform his duty leaves him subject to removal proceedings by the Governor (Constitution [New York] Article 13, section 13 [a. b.]). . . . The District Attorney is a quasi-judicial officer with wide latitude in the discretionary exercise of his duty to prosecute crimes and offenses of a criminal nature provided there is an actual and reasonable exercise of discretion within the bounds of the office's jurisdiction (People v. Tassiello, 300 N.Y. 425, 427 [91 N.E.2d 872]; Johnson v. Boldman, [24 Misc. 2d 592], 203 N.Y.S.2d 760, 762)."

As stated in McDonald v. Sobel, 272 App.Div. 455, 461, 72 N.Y.S.2d 4, aff'd. 297 N.Y. 679, 77 N.E.2d 3, cited with approval in Johnson v. Vergari, *supra*:

"At common law, no part of the power to accuse a person of crime or to prosecute a person was vested in a court. These powers were vested elsewhere. The power to prosecute crime and control the prosecution, after formal accusation has been made, was reposed in a prosecuting officer; an attorney general; a district attorney. . . ."

Hassan v. Magistrates Court of the City of New York, 20 Misc.2d 509, 191 N.Y.S. 2d 238, holds that the courts cannot and should not review a determination and decision of a district attorney as to whether to prosecute or not. See also, Prentice v. Gulotta, District Attorney of the County of Nassau, 13 Misc.2d 280, 176 N.Y.S.2d 433.

It seems clear from established authority that prosecutorial discretion of a New York State district attorney can-not be impeded by the judicial power. The remedy for an unwarranted prosecution lies with the Governor of the state, who may either pardon the defendant, or remove the district attorney from office, or both, or with the trial jury, which has a long and honored tradition of acquitting under such circumstances.

5. We did so prior to reading his June 27, 1972 decision and opinion denying the motion to dismiss the indictment. The Court has arrived, independently, at substantially the same conclusion expressed by Justice Martinis. He ruled in part as follows:

"Much has been said orally, and on papers, and the record in this case is replete with reference to the ethnic background of the defendants. The attorneys from the very inception of the preliminary proceedings in the second retrial to the present time have presented their clients as the subjects of a prosecution because of race, completely obfuscating the issue in the trial. It has been implied and directly asserted that because the defendants are black, they have been persecuted rather than prosecuted. Resort was had to unwarranted publicity. This type of propaganda that casts a cloud over our judicial process reached many people throughout the land. Resentment was sounded against the prosecutor because he continued and persisted in discharging the duties of his office, namely the prosecution of a person accused of crime until the completion of the case through a jury verdict.

As a result of this campaign, the courtroom became a theatre crowded by defendant sympathizers; handbills were surreptitiously distributed with a view of reaching the jurors, urging them to acquit the defendants. On two occasions, the jurors were accosted in the corridors of the court building and in the street. The question of guilt or innocence of the defendants became a side issue. The judgment of the witnesses and their respective testimony, by the jurors, may well have been

## I
### REMOVAL AND REMAND

Respondent's motion to remand the criminal case may be dealt with first. If petitioners could substantiate with evidence, their allegation in paragraph 11 of the petition, previously quoted, and could establish a scintilla of evidence that any determination of District Attorney Hogan to prosecute petitioners for a fourth time is based on racial discrimination, the Court might yet find lacking the essential requirement for a removal pursuant to 28 U.S.C. § 1443(1). That requirement, based on the so-called *Strauder-Rives* doctrine (Strauder v. State of West Virginia, 100 U.S. 303, 25 L.Ed. 664; State of Virginia v. Rives, 100 U.S. 313, 25 L.Ed. 667), as stated in Chestnut v. People of the State of New York, 370 F.2d 1 (2d Cir. 1966), cert. den. 386 U.S. 1009, 87 S.Ct. 1355, 18 L.Ed.2d 439, is that the denial of civil rights must also arise out of a "formal expression of state law". That is of course not present here. Georgia v. Rachel, 384 U.S. 780, 803, 86 S.Ct. 1783, 16 L.Ed.2d 925 (1966). See also People, &c v. Davis, 411 F.2d 750 (2d Cir. 1969); Varney v. Georgia, 446 F.2d 1368 (5th Cir. 1971).

However, petitioners produced no evidence to lead to such an inference of official wrongdoing by this distinguished elected prosecutor, who has served the public faithfully for almost a generation.[6]

At the hearing held before me on November 29, 1972, petitioners' attorney expressly disclaimed possession of any relevant evidence tending to prove this serious charge made against Mr. Hogan. At p. 14 of the transcript of the hearing before me, the following exchange took place:

"THE COURT: On the subject of an evidentiary hearing, I would like to direct you to Paragraph 11 [of the petition] . . . where you allege colored and influenced by the enveloping turmoil, which might have prevented a fair and impartial analysis of the facts and circumstances of the case."

. . . that the exclusive reason why defendant Hogan is insisting, and so forth.

Is there admissible evidence on this which you are prepared to give me in a hearing?

MR. KUNSTLER: Yes, your Honor. That evidence would be statistical evidence.

THE COURT: That is all?

MR. KUNSTLER: That is all. Of prior trials.

THE COURT: Can't you stipulate that in the record, if it is statistical?

MR. KUNSTLER: Yes.

THE COURT: In other words, you have no statement by the defendant [Hogan] to this effect, or anything like that?

MR. KUNSTLER: No. They are the only ones—

THE COURT: You are just inferring it from the statistics.

MR. KUNSTLER: Yes.

THE COURT: I should think you could stipulate the statistics with your adversary. I will see if I draw the same inference from them."

No statistical information was ever submitted. The affidavit of William M. Kunstler, Esq., sworn to December 30, 1972, in this case contains the following statement:

"It is true that we have submitted no statistics as to the fact that Black criminal defendants are subjected to multiple trials after hung juries more than are white defendants. In the first place, we discovered that this type of data is virtually impossible to compile. Secondly, we have been unable to find, in any jurisdiction, state or federal, any case comparable to the within one. Therefore, we are content to rest our claim that these defendants are being treated differently than any others on the *sui generis* na-

---

6. The case will not be decided by defendant Hogan, but by a New York County jury.

ture of their factual situation in order to sustain removal to this Court."

■ But mere *sui generis* will not suffice. If there were statistics which showed what the petitioners offered to show this Court, namely that retrials after hung juries [as compared with *nolle prosequi* [7] or dismissals on consent of the District Attorney] occurred more often in cases of mistrials following jury deadlock, as to Black defendants, than in the case of White defendants, this would not be proof that the District Attorney of New York County had a conscious policy or practice to discriminate against Black defendants by reason of their race.

For statistics to be meaningful, they would have to be extensive enough to permit a discrimination of judgment as to the nature and grievousness of the respective crimes involved, whether the crimes were violent, whether the criminals were recidivists, and what was the subjective judgment or recommendation of the Assistant District Attorney conducting the prosecution, as to the reason for the jury deadlock and the likelihood for future deadlock. Without such information, and more, no inference could be drawn.

Other correlations could readily exist in such circumstances. The Honorable Whitney North Seymour, Jr., United States Attorney for this District, addressed himself to statistical disparities in sentencing of Black defendants by the Judges of this Court. In a release dated January 14, 1973, Mr. Seymour stated:

"Our study does not support the conclusion that there is a differentiation in sentencing in the Southern District of New York as between black and white defendants charged with the same offense. There does, however, appear to be a form of indirect discrimination growing out of the different treatment of offenders for different classes of violations. There are plain indications that white collar defendants, predominantly white, receive more lenient treatment as a general rule, while defendants charged with common crimes, largely committed by the unemployed and undereducated, a group which embraces large numbers of blacks in today's society, are more likely to be sent to prison. If these indications are correct, then one may conclude that poor persons receive harsher treatment in the Federal Courts than do well-to-do defendants charged with more sophisticated crimes."

As noted, we have been given no statistics, but it is impossible to conceive of a chain of proof based solely on statistics from which we could infer that Black criminal defendants are retried more frequently after a jury deadlock than others are *solely because they are Black*, and not because of extraneous factors which motivate the good faith exercise of the stat prosecutor's discretion.

■ The removal, because it is based on an unproved factual allegation of racism in paragraph 11, and one which the petitioners cannot prove, and do not even offer to prove, must fail, and the motion to remand should be granted.[8]

7. Nolle prosequi has been abolished in New York. A district attorney may not nolle a New York prosecution without an order of Court, and the Court must· file, as a public record, a written statement of the reasons therefor. This has been so since 1881. See Judiciary Law, McKinney's Consol.Laws, c. 30, § 671, and Crim.Proc.Law, McKinney's Consol. Laws, c. 11–A, § 210.20.

Mr. Justice Martinis' decision of June 27, 1972, and that of Mr. Justice Fine, dated September, 1972 indicate such Court order would not be forthcoming on this record, even if the District Attorney took a different view.

8. This Court, per *Bonsal*, J., has previously remanded this same prosecution to the state court, citing the same learning on the subject of removal, as is cited herein. While the factual claims are now slightly different, the same body of law applies. See Baker et al. v. People, etc., 299 F.Supp. 1265 (D.C.1969).

## II

## HABEAS CORPUS

The other branches of relief sought, federal habeas corpus, or alternatively, a permanent injunction against the trial of the indictment, depend in each case upon the same factual contentions.

The Supreme Court has not yet considered whether a criminal defendant released on bail is in "constructive custody", so as to permit him to test the validity of the bail restriction by habeas corpus. 28 U.S.C. § 2254; Hensley v. Municipal Court, 453 F.2d 1252 (9th Cir. 1972), cert. granted October 10, 1972, 409 U.S. 840, 93 S.Ct. 43, 34 L. Ed.2d 79. There is substantial authority holding he may not do so. *Hensley, supra;* Matysek v. United States, 339 F.2d 389 (9th Cir. 1964), cert. den. 381 U.S. 917, 85 S.Ct. 1545, 14 L.Ed.2d 437; Allen v. United States, 349 F.2d 362 (1st Cir. 1965); United States ex rel. Granello v. Krueger, 306 F.Supp. 1046 (E. D.N.Y.1969).

United States ex rel. Williams v. Follette, 453 F.2d 745 (2d Cir. 1971) could be read as *contra,* but there actual state custody did exist when the petition was filed, and was held not to have been ousted by a later reduction in sentence.

Assuming that habeas corpus relief may not be granted under 28 U.S.C. § 2254, for want of "custody", petitioners may nevertheless be entitled to injunctive relief pursuant to 28 U.S.C. § 1343. We think such relief should be denied on the merits. If denial of habeas corpus solely because petitioners are free on bail is unwarranted, we would deny such relief on the merits for the reasons stated in Part III, *infra.*

## III

## INJUNCTIVE RELIEF AGAINST A RETRIAL

Petitioners rely on United States v. Castellanos, 349 F.Supp. 720 (E.D.N.Y.

1972, *Dooling,* J.). In that case, defendant was tried twice before the same United States District Judge, for an undisclosed federal crime. Each trial ended in a mistrial because of jury deadlock.

Judge Dooling found that the evidence presented a clear issue of credibility, unmistakably an issue for the jury to resolve, and that a judgment of acquittal, pursuant to Rule 29(c), F.R.Crim.P. was not justified by the evidence.

In this regard at least, *Castellanos* is identical with the instant case, because the sole issue on the record before Justice Martinis is of credibility; if the testimony of the People's witnesses, specifically that of the witness Barnes, is believed by the jury, a judgment of conviction is fully warranted, and if not, clearly defendants should be acquitted.

*Castellanos* recognizes as good law the doctrine of United States v. Perez, 22 U.S. (9 Wheat.) 579, 6 L.Ed. 165 (1824), that discharge of a deadlocked jury does not prevent a second trial, and that the defense of double jeopardy is not available to a person so retried.[9] But, in *Castellanos,* the Court found that the difference in the body of evidence presented in the two trials was not substantial, and to put the defendant to a third trial in which no real difference in the evidence is anticipated, would constitute double jeopardy. The Court held at p. 722 of 349 F.Supp.:

"To put defendant to a third trial in which no real difference in the evidence is anticipated imposes a strain on the words of the Constitutional Amendment, as they have been interpreted, that the words cannot bear. The defendant has already been twice put in jeopardy in the strict sense that he has twice been exposed undeniably and completely to the risk of conviction after a completed trial at which, as the substantial identity of the two trial records indicates, there was no defect in the evidence present-

9. See also Green v. United States, 355 U.S. 184, 78 S.Ct. 221, 2 L.Ed.2d 199;

Wade v. Hunter, 336 U.S. 684, 69 S.Ct. 834, 93 L.Ed. 974.

ed on either side brought about by adventitious circumstance, pressure of time, absence or illness of witnesses, or any other circumstance. At each trial each side presented the case that it wished to present as it wished to present it. Twice the juries were unable to reach agreement after being exhorted to renew the effort to agree despite the jury's announcement of disagreement after initial deliberation. Twice the defendant was exposed to the risk of conviction as completely as it was possible for him to be exposed."

In the instant case, unlike *Castellanos* the People's principal witness, Barnes, has apparently recanted at least once, and then recanted the recantation. We do not reach the merits of these recantations; they are questions which should be addressed to a jury, because they relate only to credibility. The state contends that the recantations occurred while its key witness was confined in a state institution and there subject to peer group pressures. This contention also relates to credibility, and is solely for a jury.

An appeal has been taken in *Castellanos*, and remains undecided. [Cf. United States v. Dooling, 406 F.2d 192 (2nd Cir. 1969), referring to a defendant who was tried *five* times.] Assuming, arguendo, that *Castellanos* correctly states the law concerning a third retrial as applied to the facts of that case, the instant case is factually distinguishable. Here is no case in which the state, enjoying its generally superior powers, seeks to convict by attrition. The underlying case is a simple case involving credibility, in which a jury, properly instructed, should be able to reach a conclusion to convict or acquit. If, as *Castellanos* suggests, a hard and fast rule of "no third trial" is

to be adopted, based on the Constitution, then an obvious inducement would exist for defendants' counsel to precipitate a deadlock, rather than seeking to resolve the disputed issues of fact, favorably to their client, if possible, but at least to resolve them.[10]

What protection is there for Society if those accused of crime, unable to defend successfully against the prosecutor's evidence and not looking forward to acquittal, intentionally go out of their way to hang the jury? If this happens, and if such tactics are reinforced by enjoining a retrial, the trial of any criminal case having the least bit of emotional interest attached to it, will become a game or contest over a deadlock. As petitioners' counsel conceded in the hearing before me (Tr. p. 26) " . . . he [Mr. Justice Martinis] blames defense counsel for *doing their job and obtaining a hung jury for their clients, rather than a conviction . . . .*"

An independent review of the trial record indicates that obtaining a hung jury was an apparent purpose on the part of the defendants, and they went about it with vigor. The trial judge, seeking to avoid reversable error, permitted the defense broad latitude which it used for making a racial plea.

Defendants' counsel were permitted personal *voir dire* with the jury, and had three weeks of extensive examination, and a large number of additional peremptory challenges granted them by stipulation.[11] Defendants could have, and should have, obtained an impartial jury, free of any racial bias and willing and able to reach a fair and reasonable determination as to the credibility of Barnes and the other witnesses for the People and arrive at an intelligent verdict, either of conviction or acquittal.

---

10. The Canons of Professional Ethics, as adopted by the New York State Bar Association (see Appendix, Judiciary Law, Book 29, McKinney's Consolidated Laws of New York Annotated) read as a whole, would seem so to require. See in particular Canons 5 and 22.

11. The People also had additional peremptory challenges by stipulation, which the prosecutor was charged with using in a racially motivated manner (p. 251).

Early in the case, all defendants inserted the issue of race. This was done regularly and consistently, in front of the jury, by comments of counsel, by questions, and by injecting irrelevancies. The court admonished the jury that "race, creed and color has no issue in this case whatsoever" (p. 77), and did so from time to time whenever the admonition was called for. This only reinforced the issue.

Outstanding in the injection of extraneous matter looking toward the creation of a jury deadlock was the continuous reference by the defense, to the "Little Fruit Stand Riot", said to be a famous historical event of 1964.

In the Little Fruit Stand Riot, as best it comes through in the trial record, it seems that ten to twelve year old children [described as "gypsy boys", i.e. Spanish, by the State's witness Barnes] overturned a fruit stand in the street and were beaten by New York City Police with clubs and blackjacks. Defendant Baker tried to intervene and was badly beaten by police, all this on April 17, 1964, just before the attempted robbery and murder in Sugar's store on April 29th.

We are told that the Harlem community considered it a gross outrage for police to beat young children for an offense of this type, (p. 432)

> "[a]nd as a result of the April 17, 1964, incident, my client became a marked man in the eyes of the police, and his neighborhood was constantly under police surveillance after that.
>
> And so, when the April 29 incident occurred at the Sugars, the Police Department did what was natural to them, they started looking for those whom they had labeled as bad.

Any investigation has to start somewhere. Suspects have to come from somewhere, and in any case—this care (sic) or any case—the police, as investigators, began to try and build a case against the suspects.

And that is what they did here."

Counsel for defendant Craig asserted to the jury that the trial was "a scheme of continuing police vengence." Thomas' attorney, Mr. Kunstler, before the jury, called the trial—(p. 441–2)

> "an unholy plot to sacrifice six black young men for purposes which I think will become clear as the trial goes on.
>
> There is not only the fruit stand riot, which you will hear about; you will also hear evidence that this was the long hot summer of 1964, and that by the six bodies of these young black men, [defendants] they intended to present an example that would, in their opinion, keep Harlem quiet in the summer of '64."

There are many other examples of how the defendants injected racial prejudice and extraneous matters, such as the Little Fruit Stand Riot, a political rally in Mt. Morris Park and the destruction, by nightstick, of the eye of an unrelated party, one Frank Stafford, by a policeman acting without provocation, (e.g., p. 926).[12]

The Court was assiduous to protect the rights of the defendants, and on more than one occasion instructed counsel to keep politics out of the trial, (e.g., p. 2133). Counsel attempted also to show animus between the District Attorney and defense counsel (p. 3113); held general extended legal arguments before the jury (e.g., p. 2124), and on at least one occasion abused the court in the absence of the jury.[13]

---

12. Stafford lost his eye in the course of his arrest some 12 days prior to the Sugar murder, and totally unrelated to it. He was convicted, on his plea of guilty, of a crime also unrelated to defendants or the Sugar murder. Whether the arresting officer did in fact use unreasonable force is not an issue litigated in the trial.

13. The following appears beginning on p. 3235:

> MR. KUNSTLER: Your Honor, I have two matters before we get on with the witness.
>
> *    *    *    *    *
>
> (p. 3240) The other is a psychological thing. I noticed very distinctly that during the time Mr. Lehner was and

The state's witness Barnes was permitted to volunteer answers involving his association with the other defendants, not only at the Audubon Ballroom, but also at "Malcolm X Lectures" and in "karate" classes. This was admissible, because the defendants had played down the relationship between themselves and the state's witness, but was not helpful to the atmosphere of the trial.

In summation, defendants had a field day; they repeated again and again their theories about the Little Fruit Stand Riot and the Mt. Morris Park meeting. They also brought in for the edification of the jury, matters involving Malcolm X and karate classes, made racist remarks and dragged into argument the subjects of Viet Nam, Dachau, Bangladesh, the Scottsboro case, Sacco & Vanzetti, anti-white Muslimism and Cotton Mather, not to mention the Knapp Commission.

Perhaps the trial court could not have prevented the defendants from dragging in much of this extraneous material, because a defendant who in good faith believes that his prosecution is evilly motivated, and that he is the victim of a frame, should have the right to convey this thought to the jury, without showing a rational basis for his belief.[14] But here, the conduct of the defendants was a direct cause, even as though it were planned, of stirring up whatever unknown, unconscious and residual racial bias any juror might have possessed [having survived such intensive voir dire, we must assume any such juror bias was at most subliminal]. Defendants clearly attempted to hang the jury over irrelevant issues, ranging all the way from the Little Fruit Stand Riot to Bangladesh.

Having elected such an approach to the case, a defendant should not be permitted to effectuate a mistrial by deadlock, and then assert that the state is without power to retry the case.

This Court believes that the conduct of the trial on the part of the defendants, calculated to obtain a jury deadlock, was such as to prevent them of taking advantage of the *Castellanos* doc-

---

your Honor was questioning the witness, when Mr. Lehner was asking the questions toward the end, that your Honor kept looking over in the general direction of this table; and I particularly thought that you were—I caught your eye many times looking up, you were looking at me; but the impression to the jury must be that you were sort of looking over here to see whether there was any intimidation being practiced upon the witness.

And if I am conscious of it, I am certain that maybe the jury was conscious of it.

THE COURT: I am looking over the entire courtroom, Mr. Kunstler, particularly over your head.

MR. KUNSTLER: Yes, your Honor, but it gave the impression that even the spectators were doing intimidating. And most of the spectators—a great many—are black and are relatives of the defendants.

THE COURT: The witness kept looking to the right and to the rear. Her attention seemed to be focused towards the rear of the courtroom.

I was particularly interested to see if there was anyone making any gestures or any motions. It wasn't directed to the counsel table. That might have been just in passing over. But I was looking over the spectators.

MR. KUNSTLER: The only problem with it, your Honor, is it perpetuates the myth . . . the only possible intimidation could come from defense sources, and not from prosecution sources.

THE COURT: You may explore that fully, as I said, on cross examination."

Apparently, defendants contended that although a cat can look at a king, the trial judge may not look at defendant's counsel.

At another point, counsel stated, apparently in the hearing of the jury, of and concerning the trial judge, "you didn't spend eight years in jail."

14. As stated by Mr. Justice Jackson, writing for the Supreme Court in Sacher v. United States, 343 U.S. 1, 9, 72 S.Ct. 451, 455, 96 L.Ed. 717 (1952): "[I]t is the right of counsel for every litigant to press his claim, even if it appears far-fetched and untenable, to obtain the court's considered ruling."

trine, if indeed the doctrine exists in this Circuit as a matter of constitutional law.

Accordingly, the application for injunctive relief is denied.

## IV

## CONCLUSION

The foregoing, insofar as it relates to the application for an injunction, constitutes findings and conclusions as required by Rule 52(a), F.R.Civ.P.

## V

## STAY OF ORDER

Inasmuch as the determinations herein made are subject to appellate review, [including the remand, see 28 U.S.C. § 1447(d)] in the interest of orderly procedure, the order shall stay the remand for a period of fifteen (15) days, within which petitioners may, if so advised, appeal, and seek a further stay pending such appeal, from the Court of Appeals. Because retrial has been delayed, and further delay serves no purpose, the Court declines to grant any greater stay. Rule 8(a), F.R.App.P.