Joseph A. Martinis, J.
The defendants, individually and collectively, move to dismiss the indictment on various grounds. *987 They each, individually and severally, raise the issue of the failure of the State to accord the defendants a speedy trial, the issues of double jeopardy, cruel and inhuman punishment, as well as the broad statutory ground in the Criminal Procedure Law embracing the lack of likelihood of success by the People represented through the District Attorney of this county, a duly elected public official.
The indictment charges each of these defendants with the most treacherous, vicious, heinous crimes known to civilized society. It alleges that each defendant participated directly as a principle in the brutal and senseless killing of Margit Sugar and in the attempted murder of Frank Sugar, by repeatedly stabbing each of them with a knife, and of an attempted robbery of the clothing store owned by the victims in their own community.
For these crimes, the defendants and two other co-defendants were tried and convicted on all the charges by this court and jury on July 17, 1965. In September, 1965 they were sentenced to life imprisonment on the murder conviction; 12% to 25 years on the attempted murder, and 7% to 15 years on the attempted robbery. The defendants commenced their terms of imprisonment.
An appeal was taken from these respective judgments to the Appellate Division of this court. On June 22, 1967 the judgment of conviction was unanimously affirmed against five of the defendants. The court divided in affirming Baker’s judgment because of a question raised as to the admissibility of the confession he made after his attorney appeared at the police station. Nevertheless, the dissenting opinion stated that 11 the evidence, apart from the confession, is adequate to support the verdict of guilty against this defendant ”. (28 A D 2d 24, 28.) Thus, as stated in the majority opinion, ‘ ‘ The court is unanimous in affirming the convictions of the other five, and also unanimous that this defendant’s guilt [Baker’s] was established beyond any reasonable doubt.” (28 A D 2d 24.)
A further review by the Court of Appeals was sought by the defendants’ court-appointed lawyers and the appeal was processed. Permission to appeal was granted: The defendants
remained incarcerated, serving their respective sentences. Fortunately for the defendants, approximately a year went by before their appeal was argued, for until that time the predicate of the reversal was not yet decided. Burton v. United States (391 U. S. 123) came down from the Supreme Court on May 20,1968, three days after the ease was argued in our Court *988 of Appeals, and it was followed by Roberts v. Russell (392 U. S. 293), on June 10, 1968, which made the Bruton case applicable retroactively. Our State court of final resort handed down its decision reversing the judgments, of conviction of the respective defendants on November 27, 1968 (23 N Y 2d 307).
The Bruton case expanded the protection afforded an accused on trial by excluding admissions or confessions made by a nontestifying codefendant. As a result of such admissions and confessions made by Bice and Ham, implicating themselves and the other defendants in the murder of Margit Sugar and the stabbing of Frank Sugar, this case was reversed.
After this decision ordering new trials as to the nonconfessing defendants, as well as to the confessing defendants, two of the confessing defendants, Bobert Bice and Daniel Ham, were severed to comply with the holding of the case.
The reversal, therefore, was not based on any lack of evidence as to the defendants ’ guilt. But, on the contrary, the court stated at page 317:
“ Defendants stand convicted of a particularly vicious crime. That there is ample evidence to establish the guilt of all six beyond a reasonable doubt (only three even bother to raise this issue).is clear from the record. We are, however, constrained by principle and precedent to reverse the judgments below and order new trials as to all of the defendants because of errors committed at the trial, which deprived the defendants of a fair trial and resulted in a constitutionally defective trial.
“ The prime error which compels a reversal and a new trial as to all the defendants is the implication of the defendants in the crime by the confessions and statements of some of their codefendants.”
Thus, just at the time the case was being considered by the court, the Bruton case came as a deus ex machina to save the defendants from unanimous affirmance of the judgment against them.
These four defendants were retried and the jury was unable to reach a verdict. According to accepted hearsay by both the defense and the prosecuting attorneys, the jurors stood eleven to one for conviction. The jury was discharged and defendants were thereafter retried before this court for a second time and again the jury failed to reach a verdict, standing, according to hearsay, 7-5 for acquittal. More will be said about this later.
- Prior to the first retrial of these defendants, Bobert Bice, one of the original defendants whose confession had implicated *989 the other five, was retried and convicted of each of the three crimes with which the defendants here are respectively charged, by a court and jury. Approximately a year after this case was adjudicated, the defendant Daniel Ham, the other defendant who had confessed, pleaded guilty to manslaughter in the first degree, attempted murder in the first degree, and attempted robbery in the first degree — admitting his participation in the crime against the Sugars together with the other five defendants. He took this plea, as reflected by the minutes, full well knowing that he would be sentenced to 15 to 35 years.
Against this background and legal history, the defense is clamoring for dismissal of these charges and the District Attorney is pressing for another trial.
Because the jury has twice failed to reach a verdict since the first conviction, the defense claims that double jeopardy has attached, thereby establishing a bar to any further prosecution. It is not now, nor has it ever been, the law as interpreted by our Supreme Court that the failure of a jury to agree upon a verdict frees the defendant from further prosecution.
None of the cases cited, with the exception of a United States District Court ease, stands for the proposition propounded by the defense. To the contrary:
“ Since 1824 it has been settled law in this Court that 1 The double-jeopardy provision of the Fifth Amendment * * * does not mean that every time a defendant is put to trial before a competent tribunal he is entitled to go free if the trial fails to end in a final judgment. ’ Wade v. Hunter, 336 U. S. 684, 688. United States v. Perez, 9 Wheat. 579; Thompson v. United States, 155 U. S. 271; Keerl v. Montana, 213 U. S. 135, 137-138; see Ex parte Lange, 18 Wall. 163, 173-174; Green v. United States, 355 U. S. 184, 188. Where, for reasons deemed compelling by the trial judge, who is best situated intelligently to make such a decision, the ends of substantial justice cannot be attained without discontinuing the trial, a mistrial may be declared without the defendant’s consent and even over his objection, and he may be retried consistently with the Fifth Amendment. Simmons v. United States, 142 U. S. 148; Logan v. United States, 144 U. S. 263; Dreyer v. Illinois, 187 U. S. 71, 85-86. It is also clear that ‘ This Court has long favored the rule of discretion in the trial judge to declare a mistrial and to require another panel to try the defendant if the ends of justice will be best served * * *,’ Brock v. North Carolina, 344 U. S. 424, 427, and that we have consistently declined to scrutinize with sharp surveillance the exercise of that discre *990 tion. See Lovato v. New Mexico, 242 U. S. 199; cf. Wade v. Hunter, supra. In the Peres case, the authoritative starting point of our law in this field, Mr. Justice Story, for a unanimous Court, thus stated the principles which have since guided the federal courts in their application of the concept of double jeopardy to situations giving rise to mistrials.
‘ * * * We think, that in all cases of this nature, the law has invested Courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances, which would render it proper to interfere. To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes; and, in capital cases especially, courts should be extremely careful how they interfere with any of the chances of life, in favor of the prisoner. But, after all, they have the right to order the discharge; and the security which the public have for the faithful, sound, and conscientious exercise of this discretion, rests, in this, as in other cases, upon the responsibility of the judges, under their oaths of office * * * ’ 9 Wheat., at 580. ’ ’ (Gori v. United States, 367 U. S. 364, 367-369.)
And in Wade v. Hunter (336 U. S. 684, 688-689) the court states:
“ The double-jeopardy provision of the Fifth Amendment, however, does not mean that every time a defendant is put to trial before a competent tribunal he is entitled to go free if the trial fails to end in a final judgment. Such a rule would create an insuperable obstacle to the administration of justice in many cases in which there is no semblance of the type of oppressive practices at which the double-jeopardy prohibition is aimed. There may be unforeseeable circumstances that arise during a trial making its completion impossible, such as the failure of a jury to agree on a verdict. In such event the purpose of law to protect society from those guilty of crimes frequently would be frustrated by denying courts power to put the defendant to trial again. And there have been instances where a trial judge has discovered facts during a trial which indicated that one or more members of a jury might be biased against the Government or the defendant. It is settled that the duty of the judge in this event is to discharge the jury and direct a retrial. What has been said is enough to show that a defendant’s valued right to *991 have his trial completed by a particular tribunal must in some instances be subordinated to the public’s interest in fair trials designed to end in just judgments.” Green v. United States (355 U. S. 184,188) states:
‘ ‘ This Court, as well as most others, has taken the position that a defendant is placed twice in jeopardy once he is put to trial before a judge so that if the jury is discharged without his consent he cannot be tried again. * * * This prevents a prosecutor or a judge from subjecting the defendant to a second prosecution by discontinuing the trial when it appears that the jury might not convict. At the same time jeopardy is not regarded as having come to an end so as to bar a second trial in those cases where ‘ unforseeable circumstances * * * arise during * * * trial making its completion impossible, such as the failure of a jury to agree on a verdict.’ Wade v. Hunter, 336 U. S. 684, 688, 689.” (Italics added.)
The only exception to the rule stated above is a lower Federal court decision (Preston v. Blackledge, 332 F. Supp. 681) that should be limited to the result reached under the peculiar facts and circumstances of that case.
For the court to adopt the rule of double jeopardy precluding further prosecution after the jury fails to agree unanimously upon a verdict, in derogation of the established law, especially in these times, would be to subvert the public interest and permit a person, however guilty of serious crimes against society, to walk away unadjudicated, thereby reducing the detriment of punishment by increasing in a large measure the probabilities of escaping it.
The argument is made that the defendants should be discharged for another reason: that a further trial of these defendants is unlikely to produce any results different from that reached in the last trial. The argument has been made both orally and in the papers that the evidence is weak, that witnesses have lied, and the good faith of the prosecutor is an issue to be considered by the court pursuant to the discretionary powers with which it is vested by statute to dismiss the indictment under certain circumstances (OPL 210.40).
Consideration in such cases must be given to whether the case that was presented on the trial is fraught with the inherent weaknesses of probative evidence that was not extant when the original indictment was presented against the defendant, or whether the passage of time has dimmed the memories of witnesses, or other facts and circumstances have appeared as to diminish the probabilities of success to such a point that con- *992 tinned prosecution is a pernicious and malicious harassment of the accused.
One of the factors to be weighed in this case is that two higher courts besides the original trial court in which they were convicted have expressed unanimous opinions as to the existence of ample evidence, apart from the confessions of the other ttvo defendants, establishing the guilt of the defendants.
Another trial utilizing the same evidence given by the same witnesses as in the trial before this court resulted in the conviction of the codefendant Robert Rice on the same three counts with which these defendants are charged. The only additional proof there was the defendant’s confession. This conviction has been reviewed and the judgment has been unanimously affirmed.
The argument that the likelihood of success by the People has been diminished is not sustained. The case against these defendants is predicated on the testimony of an accomplice who minutely detailed the plan and operation of the conspiracy to rob and kill the victims and is corroborated by the identification of the respective defendants by eyewitnesses. All these witnesses are still available and, as heretofore mentioned, gave testimony upon which another codefendant, Robert Rice, was convicted.
In passing, the court notes parenthetically, according to the accepted hearsay by both sides, that taking into account the total number of jurors that have sat on the three different trials of these defendants —28 were for conviction and 8 were for acquittal.
A frontal attack, attended by solicited publicity, was made by the defense upon the very heart of the People’s case after all the papers in the instant motion had been filed by both sides. It was asserted that one of the People’s key witnesses on the scene of the crime had lied. A formal application was made based on the defense counsel’s sworn statements that proof of such fact could be adduced from the person of Herman Joseph, a probation officer who had investigated Ollie Roe, the witness, in connection with his official duties. In furtherance of the interest of justice, the court ordered an evidentiary hearing that was to determine what Ollie Roe told Herman Joseph about his witnessing the crime.
At the hearing an extended and protracted examination revealed Herman Joseph to be an extremely truthful person compulsively exacting with himself to answer any question put to him in the most precise and correct way. He stated his dedication and loyalty to the cause of freeing the ‘ ‘ Harlem Six ’ ’ personally and as a member of the ‘ ‘ Charter Group for Pledge *993 of Conscience ”, not because he did not believe them guilty of the crime, but because he thought that the murder of Mrs. Margit Sugar and the attempted murder of Mr. Frank Sugar was a political crime. He stated that he never said that Ollie Roe put Barnes on the scene of the crime. He explained meeting Mr. Lynn on February 15, 1972, in the independent station on Canal Street and asking him if he did not know that on the night of the murder Ollie Roe picked Barnes out of the lineup. He was shocked when Mr. Lynn said he did not know this. (Although this was the testimony of Roe at the trial.)
Herman Joseph further testified that Ollie Roe told him that the boys were guilty of the crime. His personal interest was such that Joseph contacted Roe’s psychiatrist and asked him if Roe was telling the truth and the psychiatrist confirmed that Ollie was telling the truth. Joseph himself considered Ollie Roe to be very truthful. Joseph’s testimony in regard to Roe is corroborated by the probation report that he dictated from his notes in September, 1965 and which was introduced into evidence by the People. The relevant portions read as follows:
“ In 1964 the defendant was a key witness in a much publicized murder trial which involved the indictment of six youths. Because of his testimony, the defendant advised that he was threatened with beatings and personally maligned by many neighborhood groups. He stated that his family was also threatened and that when he was placed on the stand in court, the defense witness exposed him as a homosexual and drug addict and tried to discredit his testimony.
“ The defendant advised P.O. that he knew the youths who were involved in the murder as they all lived in the same neighborhood and he had gone to school with many of them. He also advised P.O. that at first he refused to identify the youths because he feared retaliation; but since he was threatened anyway, he decided to tell the police the truth about the involvement of the youths to the best of his knowledge.
“As a result of this trial and the consequences, including the subsequent sentencing of the involved parties, the defendant moved from his home. Dr. Solvino concurred that the defendant had gone through a severe period of anxiety in 1964 and felt that the defendant showed a great deal of strength by withstanding the pressures which were placed on him at the time.
“ The defendant advised that the period of the murder, the trial and the sentencing was one of great anxiety for him and it was during this period that he became addicted since the heroin placed him in a state where his fears were allayed. However, since his last hospitalization and the termination of the murder *994 trial the defendant has not used narcotics and appears to be leading as stable a life as possible.
1 ‘ During the interviews the defendant appeared to verbalize freely and impressed P.O. as being of at least average if not above average in intelligence. The defendant appears to be ambitious in terms of furthering his education and employment possibilities. It is to be noted that while he attended high school he was employed as a helper at the Tri-Borough Drug Store, 1 West 125th Street, N. T. C.”
Contrary to the defense’s claim, the court finds that the testimony given by Herman Joseph, far from discrediting the witness Ollie Roe, establishes his credibility to a moral certainty. And were proof in this regard legally admissible at the trial of the action, it would corroborate, strengthen and support Ollie Roe’s testimony in every respect.
Much has been said orally, and on papers, and the record in this case is replete with reference to the ethnic background of the defendants. The attorneys from the very inception of the preliminary proceedings in the second retrial to the present time have presented their clients as the subjects of a prosecution because of race, completely obfuscating the issues in the trial. It has been implied and directly asserted that because the defendants are black, they have been persecuted rather than prosecuted. Resort was had to unwarranted publicity. This type of propaganda that casts a cloud over our judicial process reached many people throughout the land. Resentment was sounded against the prosecutor because he continued and persisted in discharging the duties of his office, namely the prosecution of a person accused of crime until the completion of the case through a jury verdict.
As a result of this campaign, the courtroom became a theatre crowded by defendant sympathizers; hand bills were surreptitiously distributed with a view of reaching the jurors, urging them to acquit the defendants. On two occasions, jurors were accosted in the corridors of the court building and in the street. The question of guilt or innocence of the defendants became a side issue. The judgment of the witnesses and their respective testimony, by the jurors, may well have been colored and influenced by the enveloping turmoil, which might have prevented a fair and impartial analysis of the facts and circumstances of the case.
Even the court who sits as a fair and impartial arbiter was subjected to these extraneous pressures. Numerous letters and communications were received by the court responding to advertised releases and one-sided stories from the defense. On the other *995 hand, many letters were also received urging further action against the defendants.
While the court is mindful of the sympathies expressed for the defendants, and of those who seek punishment for the alleged acts of the defendants, nevertheless, such “ missives ” cannot be a substitute for the exercise of the court’s constitutional functions of administering the law. We have not reached that stage as yet, when a plebiscite should determine the fate of a defendant. Emotional expletives from the public have no place in a court of justice. A citizen has the right to be judged in accordance with the evidence presented.
The court would be remiss if it did not put to rest the unfounded assertion that no white man has been subjected to as many trials as these defendants. Nothing can be further from the truth. In United States v. Persico, a very recent case; the defendant, a white man, was tried five times and was convicted and sentenced after the fifth trial (see United States v. Dooling, 406 F. 2d 192). The court rejected the argument at the beginning of the fifth trial that the defendant had "been subjected to cruel and inhuman punishment or the fact that defendant’s right to a speedy trial had been violated.
Finally, arguments are made in the moving papers and through communications recently received that the defendants have made great strides in developing their potentials and have achieved the status and animus of becoming good and meaningful citizens of this community and that therefore the charges against them should be dismissed. It appears that one of the defendants became a painter, a writer and poet, and another has enrolled in City College, being accepted by that institution, to further his education. All of this is most commendable and a tribute to the respective defendants as well as the penal institutions that offered them the opportunity to explore their talents. While these factors are most salutary, and however much this court desires to extend its consideration to these remarkable attainments, there is no law or precedent that gives the court the power to absolve them from the serious charges that stand unresolved and unadjudicated.
While all these factors most certainly would deserve serious consideration by a sentencing Judge, a parole board, or by the Governor of this State, upon an application for a pardon, they are not pertinent on the issues now before this court.
In view of all of the foregoing and grave consideration of every argument made by the defense, the court is constrained to deny the motion and the District Attorney is directed to proceed with the trial of the case.