THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v. IRWIN SHANIS, Appellant.— Judgment of the Supreme Court, Queens County, rendered April 5, 1972, affirmed. No opinion. The case is remitted to the Supreme Court, Queens County, for proceedings to direct defendant to surrender himself to said court in order that execution of the judgment be commenced or resumed (CPL 460.50, subd. 5). Hopkins, Acting P. J., Latham, Brennan and Benjamin, JJ., concur; Gulotta, J., dissents and votes to reverse and order a new trial, with the following memorandum: This is an appeal from a judgment convicting the defendant of manslaughter in the first degree, after a jury trial, and sentencing him to an indeterminate prison term of up to three years. Much of the background leading to this alleged crime is virtually undisputed. The defendant Irwin Shanis and the deceased, William Shank, were neighbors in the same apartment house in Queens County where both had lived with their families for a number of years. There was bad blood between them and many arguments ensued, most of them initiated by the decedent who was outspokenly contemptuous of defendant's Jewish origin. Time and again he goaded the defendant into trying situations which called for utmost restraint, and constantly took occasion to cast aspersions on Jewish courage in general and defendant's courage (or lack of it) in particular calling defendant, amongst other disparaging epithets, a "yellow kike" unwilling to take part in a fight to defend his honor. Decedent was a strapping 200 pounder, a butcher by trade, who boasted of his strength and his ability to raise a quarter side of beef above his head with one arm and put it on a hook. He told defendant he could just as easily do the same to him. Defendant was no weakling; he weighed about 180 pounds, but he had only one good hand, his left hand having been injured while defendant was in the armed services and for which he had a 20% disability rating. Two of his fingers could not be straightened, nor could the hand be clenched in a normal fist. His trade is that of a photolithographer. Decedent regularly drank large quantities of beer and had apparently imbibed excessively on July 3, 1970 when the events giving rise to this indictment took place. A blood analysis showed that he had a .22% alcohol in his blood, far in excess of the statutory test acceptable as prima facie proof of intoxication for driving purposes. The fact that defendant had served in the Air Force while decedent was in the Army was another source of annoyance to decedent who regarded Air Force people as "fags and pansies", and publicly taunted defendant with such remarks. Getting down to the actual occurrence, a witness for the People established that on July 3, 1970

at about 8:30 or 9:00 P.M. he, his wife, another neighbor, Mel Krakowsky, and defendant were seated together on the lawn. Krakowsky was holding a cat. Decedent who was seated apart from them, publicly pronounced that if they were going to have a party he would have to break it up early. He then went into his apartment and returned with his dog frightening the cat which jumped out of Krakowsky's arms scratching him in the process. To avoid trouble and to get away from decedent the entire party moved to the other side of the courtyard. The decedent followed brandishing a glass of liquid he held in his hand calling defendant a "pansy" and a "busybody". Defendant tried to ignore him, but decedent would not be denied. He threw his glass aside and invited defendant to fight it out. Defendant declined, as he did a further invitation to hit decedent while his back was turned, or to take the first punch. Defendant turned his back and walked away. The only direct evidence of what happened just before the fight itself started comes from the defendant and his wife who had run downstairs to get her husband away from the scene when she heard decedent yell, "I'm going to kill you, you cowardly Jew bastard." None of the People's witnesses saw the actual start of the fight. Their main witness heard a thud and turned to see defendant and decedent on the ground with defendant on top punching Shank in the face with his good hand. However, we learn from defendant and his wife that decedent had continued to drink, refilling his glass from a bottle he had with him; continued to heap abuse on defendant calling his wife a whore and their son a bastard, finally knocking her aside ·with his arm and plunging a lit cigarette into defendant's bare˙chest. When Shank grabbed defendant by the shirt front and drew back his hand preparatory to striking him, defendant beat him to the punch and struck Shank in the face with his right fist. Both men tripped over a lawn chain and tumbled to the ground, the decedent's head striking the concrete in the process. Defendant continued to pummel decedent in the face while they were on the ground until he was pulled off by a neighbor, whimpering "you can't talk about my wife and son like that." Defendant was so overwrought that he had punched the cement sidewalk fracturing the bones in his right hand as a result thereof. The cause of death was testified to be a combination of facial lacerations, fractures of the skull, nasal and cheek bones and aspiration of blood into the lungs. The theory of the prosecution was that defendant used excessive force in repelling decedent's aggressions. In brief, that he should have realized when the right moment had come that he could safely withdraw from the fight without further risk of harm to himself and that had he done so, the decedent would not have been critically injured. From my point of view this is applying law in a vacuum. While there can be no doubt that a person may not take the law into his own hands to punish an aggressor, this does not mean that the law demands that one in the heat of battle not of his own seeking, make a fine distinction as to just exactly when the last blow is justified and the next blow will constitute excessive force. Such approach is suitable for a laboratory setting but is unsuitable for a world of real people where a person has been goaded beyond endurance and his own safety may have been in jeopardy if this bully had gotten the upper hand. Sometimes aggressive action is the only reasonable way to protect oneself and I believe that was the case here. The charge of the court was totally deficient in elucidating this central and crucial issue for the jury. It contains little but the bare bones of the "justification" defense and nothing on excessive force, the main issue. To a specific jury question requesting further instructions on excessive force, the unsatisfactory response was made that it had been covered in the main charge. Of particular application here is the last sentence

of subdivision 2 of CPL 300.10 which provides in part: "The court must also state the material legal principles applicable to the particular case, and, so far as practicable, explain the application of the law to the facts, but it need not marshal or refer to the evidence to any greater extent than is necessary for such explanation." The following, culled from the charge, would be, in my opinion, largely unintelligible to the average juror and gives the flavor of the charge in this respect: "The law says that the use of physical force is justifiable and not criminal when the conduct used is necessary as an emergency measure to avoid an imminent private injury which is about to occur by reason of a situation occasioned or developed through no fault of the defendant, and which situation is of such gravity that according to ordinary standards of intelligence and morality the desirability and urgency of avoiding such injury clearly outweighs the desirability of avoiding the injury which is sought to be prevented by the law defining the crime charged." This complicated phraseology is exceedingly difficult to comprehend and perhaps more difficult for a juror to apply unless illustrated in some way. It seems to me that the jury's verdict is not supported by the evidence and it may very well have been led astray by several red herrings introduced into the case by an overzealous prosecutor. For example, the prosecutor made constant reference to the use of defendant's cigarette lighter as a weapon because it was found at the scene, although there was no proof it had been used as a weapon; its use was not charged in the indictment and it was not received in evidence. Another example was a "karate photograph". A neighbor testified that he had been shown defendant's family photograph album, containing over 100 photographs. He recalled one of defendant in a karate outfit with some type of belt wrestling with another person also dressed for karate. There was nothing in the case to contradict defendant's perfectly innocent explanation that he had transferred his face to the body of a real karate wrestler to show his skill with photography. He testified that he had no training in and had never wrestled karate nor had he posed for the picture, and yet this spurious karate issue was kept prominently before the jury. It was dealt with extensively in the People's summation after the defense had been prevented from proving in detail exactly how the picture had been made. Incredible as it may sound the prosecutor was allowed to attack defendant's character because he had not submitted to corrective surgery on the *possibility* that his crippled left hand could be restored and thus he was defrauding the Government of the disability payments. There was a serious issue raised by defendant as to whether Shank died of the blows, the aspiration of blood or both. Dr. Baden testified on the basis of an autopsy report made by a Dr. Beagler who was not available for the trial. The court not only took the issue from the jury by asserting that the blows caused the death, although Dr. Baden had said it was a combination of causes, but erroneously refused to allow the autopsy report itself into evidence (*People* v. *Nisonoff*, 293 N. Y. 597). In addition the prosecutor was allowed to cross-examine on collateral matters and then call an independent witness on the issue in clear violation of proper trial procedure (*People* v. *McCormick*, 303 N. Y. 403). There are other errors too, some small and some of greater significance, but the over-all effect in my opinion was to deprive the defendant of a fair trial. We are dealing with a defendant with a clean record in a very close case wherein cumulative errors such as these should not be overlooked. I would reverse the conviction and order a new trial where we may anticipate there will not be a repetition of the excesses of this one and the conduct of the prosecutor will be kept within proper bounds.