Leonard L. Finz, J.
The central motion herein, despite its being bracketed with two other motions of a rather perfunctory nature, is one of considerable legal importance seldom approached and rarely considered seriously except under the most extraordinary circumstances. The two other motions shall be dealt with later in this opinion.
We now proceed to the third and most perplexing branch of this motion which seeks a dismissal of the indictment under CPL 210.40. The lack of any specific authority addressed to the unique situation involved herein invites a detailed study, analysis and history of CPL 210.40. That section provides as follows:
"§ 210.40 Motion to dismiss indictment; in furtherance of justice
*691 "1. An indictment or any count thereof may be dismissed in furtherance of justice, as provided in paragraph (i) of subdivision one of section 210.20, when, even though there may be no basis for dismissal as a matter of law upon any ground specified in paragraphs (a) through (h) of said subdivision one of section 210.20, such dismissal is required as a matter of judicial discretion by the existence of some compelling factor, consideration or circumstance clearly demonstrating that conviction or prosecution of the defendant upon such indictment or count would constitute or result in injustice. (Emphasis supplied.)
"2. An order dismissing an indictment in the interest of justice may be issued upon motion of the people or of the court itself as well as upon that of the defendant. Upon issuing such an order, the court must set forth its reasons therefor upon the record.”
The circumstances leading up to this motion consist of a five-year history of legal entanglement commencing on September 17, 1970 when the defendant, Irwin Shanis, was indicted and charged with the crime of manslaughter in the first degree, as well as two and one-half years of a corrosive relationship between the defendant and the decedent prior thereto. The first trial resulted in a mistrial when the jury was unable to agree on a verdict. In November, 1971 the case again proceeded to trial, at the conclusion of which the defendant was found guilty. The conviction was affirmed in the Appellate Division, Second Department, without opinion. Presiding Justice Gulotta, however, raised a vigorous dissent in which he urged a reversal and a new trial (People v Shanis, 42 AD2d 870). Focusing on the dissent of Justice Gulotta and on several enumerated errors contained in the trial record, the Court of Appeals unanimously reversed, noting that "the cumulative effect was to deprive the defendant of a fair trial” (People v Shanis, 36 NY2d 697, 699). Now, more than five years after its commencement, the case is again before this court awaiting yet a third trial.
The facts of this case, narrated in Justice Gulotta’s dissenting opinion in graphic and meticulous detail, present a tragic tale of a social illness that has plagued society since the beginning of its eon, namely the inability of man to dwell in peace with his neighbor. While there is no need to repeat the background at length, a proper comprehension of the events, both factual and legal, which preceded this motion, demand *692 that the dissenting opinion mentioned above be read in conjunction with what follows. In order, however, to provide a more understandable frame of reference for this motion, the following is a summary.
The defendant and decedent were neighbors in a two-story garden apartment dwelling in Queens County. Because of defendant’s religious faith, decedent was outspokenly contemptuous of him and constantly took occasion to defame defendant’s origin, casting aspersions on the defendant’s manhood, and on occasion referring to his wife as a whore and to his adopted son as a bastard. Despite this constant vilification of the defendant and his family as well as numerous taunts and challenges over a period of some two and a half years, the defendant was able to avoid any direct confrontation with decedent, though on many occasions it necessitated the utmost restraint. On the day in question, howevér, the harassment by the decedent (who was in an intoxicated state) proved to be too unendurable even for a man of defendant’s patience. It appears in the record that immediately prior to the underlying homicide herein, defendant had declined at least two invitations to fight and for several hours had ignored a continual stream of vituperation aimed by the decedent at defendant’s wife, his child and himself. It was only after decedent had assaulted the defendant’s wife and thrust a lighted cigarette into defendant’s bare chest that, stung beyond endurance, the defendant was galvanized into striking a blow at the decedent. In the ensuing struggle in which both were vigorous participants, the decedent received certain injuries and subsequently died. It is the prosecution’s contention that the degree of force used to defend against decedent’s aggression was in excess of that which was necessary, under the circumstances. That, it is urged, is the element which makes the defendant answerable to the People for his violation of the criminal laws of this State.
In order, therefore, to arrive at a decision which will accord with the section under which this motion is made, it has been necessary for the court to burrow into the roots of CPL 210.40 to determine its appropriate application. This was necessitated by the fact that in the midst of the many provisions indicating the methodology for the prosecution of the crimes defined in the Penal Law, the CPL contains this surprising provision which seems to open the door of the courtroom and, despite the evidence existing against an accused, allows such a de *693 fendant, in the discretion of the court and "in furtherance of justice”, to walk out a free person. This presents an enigma, the solution of which requires a close examination into the history and application of this concept.
CPL 210.40 evolved from the common-law power of nolle prosequi under which the prosecuting attorney, at his sole discretion, could choose not to prosecute a case even after indictment. (5 Wharton’s Criminal Law and Procedure, pp 225-28 [1957]; People v Willis, 23 Misc 568; People ex rel. De Vasto v Dillon, 278 App Div 674). The right of nolle prosequi was codified under section 671 of the Code of Criminal Procedure. Similarly, other jurisdictions have adopted almost identical statutes (see, e.g., Rules Crim Pro, 17 Ariz, Rev Stat Ann, rule 16.7; Cal Penal Code, § 1385; Iowa Code, § 795.5; Ore Rev Stat, § 135.755; Okla Stat Ann, tit 22, § 815) or some restricted form of it (see, e.g., Fed Rules Crim Pro [in US Code, tit 18, Appendix, rule 48]; Mass Gen Laws, ch 277, § 70A; Pa Stat, tit 19, § 491; Tenn Code Ann, § 40-2101). Judicial interpretations of these similar statutes have also ''been in accord with the New York interpretation.
In Arizona it was held that while the prosecuting attorney has. discretion in deciding whether to bring criminal action, he has no authority to dismiss pending criminal prosecution and may only recommend dismissal to the court and actual dismissal is solely within the court’s discretion. (Matter of Parham, 6 Ariz App 191.)
California seems to have had wider experience with its related statute. In attempting to define "furtherance of justice” as used in that section (Cal Penal Code, § 1385), the court stated that it requires "consideration of the 'constitutional rights of the defendant and the interests of society’ ” (Matter of Pfeiffer, 264 Cal App 2d 470, 477). To the same effect was People v Winters (171 Cal App 2d 876, 881): "The legislature has not attempted to define the expression 'in furtherance of justice,’ and therefore it is left for judicial discretion exercised in view of the constitutional rights of the defendant and the interests of society to determine what particular grounds warrant the dismissal”.
The most explicit of this group of California cases defined the issue as follows:
"The Legislature has given the trial court the power to dismiss under the broad standard of justice, and in view of the high caliber of our trial judges and their responsibility to the *694 electorate we believe that recognition of such power in cases of conflicting evidence will not result in abuse but to the contrary belief that the due exercise of the power to dismiss in proper cases of conflicting evidence will further justice. * * *
"A determination whether to dismiss in the interests of justice after a verdict involves a balancing of many factors, including the weighing of the evidence indicative of guilt or innocence, the nature of the crime involved, the fact that defendant has or has not been incarcerated in prison awaiting trial and the length of such incarceration, the possible harassment and burdens imposed upon the defendant by a retrial, and the likelihood, if any, that additional evidence will be presented upon a retrial” (People v Superior Ct. of Marin County, 69 Cal 2d 491, 504, 505).
Reverting to the laws of the State of New York pertaining hereto, we find that section 671 of the Code of Criminal Procedure differed from nolle prosequi in that section 671 transferred the right to dismiss the indictment from the prosecuting attorney to the court. (Matter of McDonald v Sobel, 272 App Div 455, affd 297 NY 679.) Thus, it is now well recognized that under section 671 it is within the court’s sole discretion to dismiss an indictment in the furtherance of justice. (People v Davis, 55 Misc 2d 656; People v Williams, 140 Misc 35; People v Schmetterer, 50 NYS2d 297; see, also, Matter of McDonald v Sobel, supra; People v Jayson, 31 AD2d 551; People v Campbell, 48 Misc 2d 798; cf. Matter of Negro v Dickins, 22 AD2d 406; People v Catlin, 31 Misc 2d 530; People v Phillips, 14 Misc 2d 565; People v Santoro, 63 NYS2d 615.)
Section 210.40 of the current CPL is essentially a restatement of section 671. The sections differ only in that now, under CPL 210.40, the defendant may also move to dismiss in the interest of justice. (People v Graydon, 69 Misc 2d 574.) Consequently, the application of CPL 210.40 should be applied in the same context.
Application of CPL 210.40 is predicated upon a "sensitive balancing” of the interests of the individual and those of the State. (People v Kwok Ming Chan, 45 AD2d 613, 616 [Per Curiam].) As defined in People v Davis (55 Misc 656, 659, supra): "The purpose of section 671 is to give a court power in appropriate but rare circumstances to allow the letter of the law gracefully and charitably to succumb to the spirit of justice.” Further, in People v Quill (11 Misc 2d 512, 513), it was recognized that: "The power to discontinue prosecution of *695 a crime vested by that section [§ 671] in the court has little or nothing to do with the legal or factual merits of the charge. Nor is it concerned with the guilt or innocence of the defendant. Such a dismissal, is concerned, as the statute states, solely with principles of justice.”
The factors necessary to be considered in deciding a 210.40 motion were enumerated by Mr. Justice Hopkins in People v Clayton (41 AD2d 204, 208). There he lists such factors to be: the nature of the crime; the available evidence of guilt; the prison record of the defendant; the punishment already suffered by the defendant; the purpose and effect of further punishment; any prejudice resulting to the defendant by the passage of time; and the impact on the public interest of a dismissal of the indictment.
Adopting the standards raised in People v Clayton (supra), the court must now measure the defendant against them to determine whether he meets the requirements for the exercise of the court’s discretion in his favor.
A. The Nature of the Crime.
Here we have a charge of manslaughter, a crime which chronically besets society, the crime of passion, the product of momentary aberration or even the result of pure reckless conduct. In this case it is difficult to find a category except for the fact that a homicide resulted. One cannot ignore that human life is sacrosanct, that the taking thereof is forbidden by every law conceived by man or directed by Deity. Yet, through the ages man has preached peace and practiced war; he has counseled kindness and countenanced cruelty. The fact is that the law has always recognized that there are very special instances when the taking of life may be, if not condoned, at least excused.
It was pointed out by the Court of Appeals in this case that the defense of justification was available to the defendant (Penal Law, § 35.15) but that this defense was charged upon the second trial in a manner which might have left the jury confused as to its import. This pertinent section permits one the use of "physical force upon another person when and to the extent he reasonably believes such to be necessary to defend himself or a third person from what he reasonably believes to be the use. or imminent use of unlawful physical force” (emphasis added). In the decision reversing the conviction the point is made that such force may be used in defense *696 of oneself or a third person. Nothing was said in the reversal, however, as to the degree of force used to repel the attack. An important phrase in the statute is that the defender from an assault may use such force "to the extent he reasonably believes such to be necessary”.
Here indeed is the key to the entire case. It was not the contention of the People that the defendant was using force against the decedent, but rather that the force used was excessive. It should be remembered that the provocation suffered by the defendant before he was attacked would have stimulated a violent response from the most passive of men. When at last he was forced to defend not only himself but also his wife, it must have been as though the dam behind which he had stored up his reserve of patience had suddenly burst, releasing the flood of anger, humiliation and frustration beyond all control.
This was not even a case where the defendant, believing himself in imminent danger of attack, struck the first blow. The defendant and his wife were already under assault. The defendant’s wife had been struck or pushed aside, the cigarette had been thrust into the defendant’s chest and the decedent had raised his arm, threatening a crushing blow to the defendant. Is it to be said that striking out at his assailant was intemperate violence?
Again, this court must call upon the eloquence of Presiding Justice Gulotta to describe the alleged excessive use of force: "The theory of the prosecution was that defendant used excessive force in repelling decedent’s aggressions. In brief, that he should have realized when the right moment had come that he could safely withdraw from the fight without further risk of harm to himself and that had he done so, the decedent would not have been critically injured. From my point of view this is applying law in a vacuum. While there can be no doubt that a person may not take the law into his own hands to punish an aggressor, this does not mean that the law demands that one in the heat of battle not of his own seeking, make a fine distinction as to just exactly when the last blow is justified and the next blow will constitute excessive force. Such approach is suitable for a laboratory setting but is unsuitable for a world of real people where a person has been goaded beyond endurance and his own safety may have been in jeopardy if this bully had gotten the upper hand. Sometimes aggressive action is the only reasonable way to *697 protect oneself and I believe that was the case here.” (42 AD2d 870, 871, supra.) .
There is also to be considered the question of what it was that ultimately caused the decedent’s death. The Court of Appeals dwelt briefly on this facet of the case, indicating that were the autopsy record permitted into evidence it could well have affected the outcome of the case (citing People v Nisonoff, 293 NY 597). "In short”, said the court in reversing the conviction herein, "the report was competent proof and relevant to an issue in the case.” (36 NY2d 697, 699, supra.)
The court recognizes that much of what has been said herein relative to this initial factor proposed by Mr. Justice Hopkins in Clayton may really have to do with questions of fact to be submitted to a jury, but so undisputed are many of the facts and so close to the borderline are the conclusions to be drawn from them that it can almost be said that a conclusion of guilt beyond a reasonable doubt could not be reached as a matter of law. In any event, we do not reach this decision but merely ponder it as one of the factors to be considered in this motion.
B. The Available Evidence of Guilt.
By this factor one must suppose that the court had in mind the availability of witnesses and the durability of their memories. The court is not apprised by either side as to whether any of the witnesses are unavailable. The District Attorney in his review of the testimony given by the various witnesses does not indicate that they will be able to appear again. He adds only that in any case their prior testimony can be read pursuant to CPL 670.10 (People v Simmons, 36 NY2d 126). Significantly, it is conceded that there are no eyewitnesses to the commencement of the attack, that on the evening of the homicide "the decedent was racially abusive toward the defendant, disruptive to the neighborhood and challenged the defendant to fight”. The same evidence, presumably, was presented in the second trial as in the first. That there was a conviction by the second jury, where the first had disagreed, could easily be attributed to the errors pointed out by the Court of Appeals. That there is evidence of guilt (excessive force) seems most questionable to this court.
In People v Baker (70 Misc 2d 986) as in this case, a motion was made after the case had gone to the Court of Appeals, was reversed and sent back for a new trial. While denying the *698 motion for reasons sufficient in that case, the court stated (pp 991-992): "Consideration in such cases must be given to whether the case that was presented on the trial is fraught with the inherent weaknesses of probative evidence that was not extant when the original indictment was presented against the defendant, or whether the passage of time has dimmed the memories of witnesses, or other facts and circumstances have appeared as to diminish the probabilities of success to such a point that continued prosecution is pernicious and malicious harassment of the accused.”
C. The Prison Record of the Defendant.
This factor might relate to the length of time a defendant had been incarcerated. In this case it was a matter of days. If it relates to the prior criminal record of a defendant, then it can be stated that this defendant has no record at all. The District Attorney, in his zeal, urges that this defendant does indeed have a "criminal” record since he was once arrested for assault. Moreover, the affidavit is somewhat ambiguously worded, giving the impression that there were two separate crimes of assault. The court, however, at the hearing on this motion, verified that both arrests were based on one and the same incident and that the defendant was acquitted after a trial. Does one retain a criminal record after acquittal? This court considers that he does not.
D. Punishment Already Suffered.
Defendant has always been a respectable citizen, presently married and the father of a seven-year-old child. He maintains an unblemished past record, including an honorable discharge from the Air Force where he injured his left hand and received a 20% service connected disability. Further, more than 50 appearances in many courtrooms have resulted in a crushing financial burden as a result of which the defendant was forced to file a petition in bankruptcy (he received a discharge in bankruptcy from the United States District Court, Eastern District, on June 12, 1973), despite the fact that defendant has been steadily and gainfully employed for the last 20 years. While he is presently represented by the same attorney who originally defended him, that attorney was appointed by the court under article 18-B of the County Law when the defendant ran out of funds. Defendant has already suffered through two trials and has exercised his appeal rights *699 to the limit, yet he remains in the same status now as he was more than five years ago when these most unfortunate events first began. Although there has been little or no punishment by physical incarceration, the overwhelming mental and emotional strains suffered by the defendant have operated as a far more crushing imprisonment than could any bare restriction of his physical person. Would it be "in furtherance of justice” to subject the defendant and his family to the psychological pressures of still a third trial (United States v Jorn, 400 US 470; Green v United States, 355 US 184), particularly where such ill-fated circumstances led to the event in question? The language of the court in People v Davis (55 Misc 656, supra) is most peculiarly applicable to the case before us. There it was stated (pp 659-660): "This court believes that the instant case involving as it does a defendant of exceptional background and promising future and charged with a crime, conviction of which would sully the one and stifle the other, is a case crying out for the application of this most humane statutory provision.” Indeed, the same result was reached in other cases where facts much less compelling than those before us existed. (See People v Phillips, 14 Misc 2d 565; People v Caccamise, 187 Misc 705.)
A more recent decision, People v Carlo (Sup Ct, New York County, July 10, 1975, Vol 174; NYLJ, July 11, 1975, p 10, col 6), also attains this same result. Although certain distinguishing factors exist between this case and Carlo, in both cases (col 8) "[t]he defendant established, to the satisfaction of the appellate court, that the initial trial fell far short of a fair trial. Whether a fair trial would have resulted in his complete acquittal cannot be known.” Further, the concluding paragraph in Carlo is equally applicable here. There the court stated (col 8): "The people do not articulate any public interest or any right of the complainant that would now be served by a conviction. Nor can it be shown that upon a conviction any sentence should now be imposed on the defendant on any theory of punishment, cfeterrent or rehabilitation.”
The court cannot leave this point without commenting on a remarkably ironic circumstance elicited during the hearing herein. Approximately a year before the incident which is the subject of the indictment herein, the decedent was stricken with some form of illness as a result of which he appeared to be strangling. The decedent’s child rushed to the defendant herein who, responding with all the instincts of a Good *700 Samaritan, rushed his tormentor to a hospital, possibly saving his life. Now the defendant stands before the bar of justice like Cain, for taking that very man’s life, although unlike Cain he did not plot his brother’s demise.
E. Purpose and Effect of Further Punishment.
"The trial court, upon conviction of the defendant, had imposed a sentence of three years in prison, which was set aside. Having reviewed all of the facts and circumstances available, this court is unable to visualize any purpose to be sqi^vecL by further punishment although it is far easier to imagine its effect. As it was so aptly put by his attorney, the defendant has had this Sword of Damocles dangling over his head for five years. Assuming him to be the ordinarily law-abiding citizen with good societal instincts, which the court finds he is, the contemplation of a trial for homicide and the consequent result of incarceration in prison must have a devastating effect, not only upon the defendant but also upon bis wife and child, the child being old enough to comprehend to some extent the predicament of his father but young enough to magnify the situation in his mind even beyond its actual horror. To live under the pall of this affair for over five years is to multiply by the number of days the agony of its continuance. Moreover, recalling once more the Good Samaritan action of the defendant described above, this court is confident that regardless of any action taken here, this defendant will never be able to obliterate from his mind and conscience the burden he carries in the knowledge that he destroyed a human being, no matter what the cause. This might serve as little solace to the decedent’s family. But they as well as the rest of society are mindful that the law seeks neither vengeance nor retribution and that its sole quest is for justice in its broadest and fairest sense.
F. The Prejudice Resulting from the Passage of Time.
It is well known that time has its peculiar effect on the memory of witnesses. Bearing in mind that several witnesses viewing the same event frequently do not agree on what occurred, one must question the reliability of the accounts to be given at a third trial, more than five years after the event. Notoriously, time is a telescope. At times it enlarges, at others it diminishes, depending on which end of the telescope the viewer finds himself. To suggest what prejudice, if any, could *701 result by way of memory or recollection from the passage of more than half a decade is but to speculate upon the frailties that most humans possess.
G. Impact on Public Interest of Dismissal of Indictment.
This is a factor which is most difficult to determine. The initial question must be, what is the extent of the public interest in this matter today? Before this motion was brought, this court had no awareness of this case. Neither the defendant nor the decedent were people in the public eye. The mention of either of their names to anyone but their families, or perhaps their immediate neighbors, would undoubtedly bring a shrug or a blank stare. Nor was this a case of peculiarly heinous connotations where the news media had repeatedly recounted its occurrence either in print or through the air. From any aspect, therefore, it is difficult for this court to visualize any great impact on the public interest by a dismissal of the indictment.
Finally, and in the course of reviewing the factors set before it by the Appellate Division decision written by Mr. Justice Hopkins, the court has at all times had in the forefront of its mind the conviction that CPL 210.40 must never be carelessly applied or extensively employed. Long and careful thought has been given to the many considerations entering into a decision of this kind. Instead of seizing on the facile escape to "Let the jury decide”, this court has elected to face the question, "What is just and equitable?”
Perhaps Aristotle, who despite the erosion of time still emerges as the father of logic, reason and order, can best provide the answer: "Equity bids us be merciful to the weakness of human nature; to think less about the laws than about the man who framed them, and less about what he said than about what he meant; not to consider the actions of the accused so much as his intentions, nor this or that detail so much as the whole story; to ask not what a man is now but what he has always or usually been.”
To any jurist who is daily involved in seeking the true application of equity and justice, the temptation to continue to pursue its many descriptions and definitions forever looms. This court, however, will not elaborate on this subject beyond the finding that in the "furtherance of justice” the indictment herein must be dismissed. Having reached this conclusion, it *702 is unnecessary to decide the remaining two motions which now stand moot and academic.