THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v DAVID SAFIAN, Appellant.

Second Department, July 11, 1977

*Litman, Friedman & Kaufamn (Herman Kaufman* and *Jack T. Litman* of counsel), for appellant.

*Carl A. Vergari, District Attorney (Jeanine Ferris Pirro* of counsel), for respondent.

TITONE, J. In this appeal from a conviction of murder in the second degree, appellant David Safian contends, *inter alia:*

(1) that the trial court erred in denying his motion to sever his trial from that of codefendant Robert Miner on the ground that there was a substantial risk that the deliberations of the jury would be improperly affected by incriminatory and unredacted references to Safian in Miner's confession and admissions; and

(2) that error was also committed by the trial court in refusing to charge manslaughter in the first degree as a lesser included offense under the second degree murder count. According to appellant, a reasonable view of the evidence would have permitted the jury to find that when he told Miner to "take care of" his wife, he only intended her to be physically assaulted, but not killed.

### THE FACTS

On the evening of May 2, 1975 Deborah Safian, the wife of appellant, was stabbed to death by codefendant Robert Miner

outside of her home in Tuckahoe, New York. Miner committed the homicide allegedly pursuant to an agreement made with Safian. Several days after the killing Miner gave a statement to the Tuckahoe police in which he related the following facts:

After acknowledging that he had been given his *Miranda* warnings, Miner stated that Safian, while in the Roosevelt Bar and Grill one evening, saw his automobile being kicked by Miner. A short scuffle ensued between them and, shortly thereafter, Miner was arrested on Safian's complaint. However, after the matter was resolved amicably, they became friendly and started to meet each other at the same bar and grill.

On one of the subsequent meetings at the bar, Safian mentioned to Miner that he (Safian) "needed a job done on a couple of people" and that "he needs two people knocked off, one of the persons he was thinking of doing himself and the other he said he couldn't do himself as he needed a solid alibi which I found out later he needed the alibi as it was his wife."

The following week Safian again saw Miner and said he needed the job done. To this Miner replied: "you get me a piece, talk the right figures and give me some information and I will do it." A week later Miner agreed to use a knife after being informed by Safian that he could not get a "piece". A couple of nights later Safian pointed out where the intended victim lived and also where she worked as a waitress on weekends (Cooky's Steak Pub in Yonkers). He also informed Miner that she finished work between 11:30 P.M. and 3 A.M., pointed out her car and gave Miner a brief description of her general appearance. Safian also said that he would be at the Roosevelt Bar and Grill on weekend nights between 10 P.M. and 3 A.M. "until it's done", so that he would have an alibi.

On Friday, May 2, 1975, at about 11:30 P.M., Miner stopped his motorbike behind the victim's car as she was getting out and asked her directions to Central Avenue. As she was writing out the directions, Miner took out his knife. When she saw the weapon, she started to run; however, Miner caught her and stabbed her about 19 or 25 times. The victim screamed several times and then went limp. When Miner heard someone yelling, he ran to his bike and "split".

Some days thereafter, Miner saw Safian at the bar, but pretended not to know him. Safian left and Miner followed five minutes later. Miner complained that "you should have told me it was your wife". Safian said he would be in touch

and Miner suggested he get in touch through a friend. Although the two met a couple of times thereafter at the bar, Safian refused to give Miner any money because "the cops were really coming down on him".

On May 22, 1975, as a result of Miner's confession, Safian went to the Tuckahoe Police Station upon request. After receiving his *Miranda* warnings, Safian engaged in about an hour-long conversation with a police investigator named Conner. During the course of the colloquy, Safian repeatedly mentioned that his daughter had been mistreated by his late estranged wife. When Conner advised Safian that it would be better if his daughter knew whether her father had something to do with her mother's death, and that the courts would probably permit Safian's mother to raise the child, Safian indicated that he would divulge his role in the homicide. At this point, Conner called in Captain Norman, to whom Safian said that he told Miner that "he wanted to get rid of a person". Thereupon a stenographer recorded Safian's statement, the gist of which is as follows:

After acknowledging that he had been given his rights, Safian said that he first encountered Miner one night when he observed the latter kicking his car, which was parked in the lot adjacent to the Roosevelt Bar. Safian ran out with a pool stick, but tripped and fell. A friend of his grabbed Miner, dragged him into the bar, and called the police. The police took Miner to the station house, where Safian met them and gave the necessary information.

A couple of weeks later, Miner came to the bar and apologized for the earlier incident. On a subsequent night, Miner met Safian at the bar. According to Safian, the following ensued: "Then I told him I was looking for some crazy guy *to take care of this girl I know.* He told me he was crazy and could use money to buy a motorcycle and I told him I would talk to him. He said, 'How much?' " (Emphasis supplied.) After a brief bargaining session, the parties agreed on a figure of $1,000. Safian, on a subsequent night, showed Miner her home and where she worked, and "left it up to him".

After Safian heard about the killing, Miner met him at the bar and said that "[h]e didn't mean to do it that way. I told him he was crazy, he was sick. I don't know, maybe the way he did it."

Safian went on to explain: "A couple of times he came into the Roosevelt Bar. When I realized how it was done I figured

he did it, stabbed her. * * * He said to me to set up a meeting place to pay him. * * * I had money set aside at home, but not for him, just money saved. When I was talking to him you say these things. I never expected him to do it. Well, the reason it came into my mind to do it is that I felt that she was trying to put the children aside to better herself."

Safian stated that he did not like the fact that his wife would leave the "baby" with a babysitter while she attended classes at Westchester Community College and worked at night.

After Safian had given the statement, Investigator Connor asked: "How do you feel, Dave?" He replied: "Highly relieved. It's been on my chest for a couple of weeks. I'm glad to get it off." Thereafter, the statement was typed, shown to Safian, and signed by him. While he was being booked on the second degree murder charge, *a Sergeant Small asked Safian if he felt better since admitting his part in the killing of his wife.* To this Safian replied that *"he felt like the world was lifted from his shoulders."* (Emphasis supplied.)

Subsequently, both Miner and Safian were indicted for murder in the second degree and criminal possession of a weapon in the fourth degree.

### HUNTLEY HEARING

Prior to the trial, two separate *Huntley* hearings were held to determine the voluntariness of the respective statements. Although Miner testified at his hearing, Safian's attorney did not cross-examine him. Following the hearings, the court ruled that the statements had been voluntarily given and thus were admissible at the trial.

Also prior to the trial, counsel for each defendant moved for a severance under *Bruton v United States* (391 US 123). They argued that each statement was essentially different from the other and that each contained remarks which would be highly prejudicial as to the other defendant. After hearing extensive oral argument, the court, in an oral decision, held that the two statements were essentially alike and denied the motions. Regarding Safian's motion, the court also noted that since Miner had taken the stand at his *Huntley* hearing, Safian had been given an opportunity to cross-examine the codefendant in satisfaction of the confrontation clause of the Sixth Amendment. The court also denied Safian's motion to redact certain

incriminating references to him contained in Miner's written and oral statements.

At the joint trial, the written statements of the defendants were introduced into evidence and testimony was given by the various police authorities as to oral statements made by both. Miner did not testify. The jury returned a verdict finding both defendants guilty as charged.

Subsequently, the court sentenced both defendants to the maximum term permissible by law on the second degree murder conviction—25 years to life imprisonment.

The crux of this case rests on whether the statements of Miner and Safian were so similar as to have permitted the joint trial, even though Miner did not take the stand. At the outset, a brief review of the relevant case law would be helpful.

In *Bruton v United States* (391 US 123, *supra*), the Supreme Court held that the admission of a confession made by one defendant, who does not testify, and which contains references implicating his codefendant, violates the latter's right of cross-examination under the confrontation clause. The court noted that there is a substantial risk that the jury, even with limiting instructions, may consider the implicating references in determining the codefendant's guilt. Unless the implicating references can be effectively deleted, the statement is not admissible unless separate trials are had.

However, the New York Court of Appeals has defined certain instances where the *Bruton* rule would not be violated:

(1) where the confessing defendant testifies at the trial, thus affording the codefendant an opportunity to cross-examine him *(People v Anthony,* 24 NY2d 696);

(2) *where the confessing defendant testifies at a Huntley hearing, although not taking the stand at the trial (People v Stanbridge,* 26 NY2d 1); and

(3) *where the codefendant has himself confessed substantially to the same effect as the confessing defendant (People v McNeil,* 24 NY2d 550).

In the case at bar, Miner testified at his *Huntley* hearing. Contrary to the position taken by Mr. Justice SHAPIRO, Safi-

an's attorney was afforded full opportunity to cross-examine Miner about his written confession. It is true, as my dissenting colleague indicates, that at the outset of Miner's *Huntley* hearing, the court erroneously ruled that Safian's attorney would not be permitted to question Miner. It is likewise true that he adhered to that erroneous ruling on more than one occasion during the hearing.

However, the hearing minutes also reveal that after the Assistant District Attorney concluded his cross-examination of Miner, the court reversed its prior ruling and advised Safian's attorney, Mr. Keogh, that it would permit him to cross-examine Miner. After a recess was taken to give Mr. Keogh time to make a decision as to whether he would cross-examine Miner, the court reiterated to Mr. Keogh that he could cross-examine Miner *"in any respect whatsoever about those damaging statements* [made in Miner's written confession]" (emphasis and bracketed matter supplied).

Later that same day, the court elaborated on its reversed ruling, with the following remarks:

"but since testimony was given on the stand affecting your client, I said I am opening up the hearing to you to cross examine because I think under absolute fairness that is your right of confrontation. You can take advantage of it or not take advantage of it, that is your decision. * * *

"Obviously, if the statements which were made which were adverse to your client and if they were not voluntarily made, why, that is something you have a right to bring out. Whether the statements, by way of example, are untrue, because of deliberate prevarication or because they are untrue because of coercion of any kind, why, that is still for the same reason the statements could be, and I am only using the words could be, untruths.

*"So, anything which would influence the validity of these statements, as long as I am giving you the right of confrontation, I certainly would permit you to ask* * * * but I am giving you this right because of the *Stanbridge* case * * * over Mr. Connelly's [Miner's attorney] vehement objections * * * I am so directing [that Miner answer questions on cross-examination], except as to those questions which may be objected to by either Mr. Connelly or by Mr. Cowhey [Assistant District Attorney] in which the objections are sustained. With that limitation, I am so directing" (emphasis and bracketed matter supplied).

With respect to Mr. Justice SHAPIRO's observations concerning the direction of Miner's attorney that he (Miner) not answer any questions on cross-examination by Safian's attorney, the court forcefully and correctly held that Miner's attorney had no right to take that position since his client had taken the witness stand. On still a later occasion, during a colloquy, the court advised Miner's attorney that he was not at liberty to direct his client not to answer any questions on cross-examination, since his client had "opened the door" by voluntarily testifying.

Thus, I cannot agree with the dissenter's conclusion that Safian had "no real opportunity to test the verity of the confessions made by him [Miner] as opposed to the manner in which they were obtained". In my opinion, consistent with the holding in *People v Stanbridge* (26 NY2d 1, *supra)*, the *Huntley* minutes clearly demonstrate that the court, in its corrected ruling, afforded Safian's attorney every opportunity to confront Miner as to the background and contents of his confession, and that the attorney chose not to take advantage of the opportunity. That this case is "on all fours" with the holding in *People v Stanbridge (supra)* is manifest from an examination of the *Stanbridge* decision. In *Stanbridge,* upon a remand from the Supreme Court of the United States, the Court of Appeals held that unlike the situation in *Bruton,* where there was a complete lack of confrontation, there was a full opportunity for Stanbridge's lawyer, in an adversary proceeding at the *Huntley* hearing, to examine the codefendants as to the statements made by them involving Stanbridge, and that while the lawyer did cross-examine one of the codefendants, he did not take advantage of his opportunity to cross-examine the other. Thus, concluded the Court of Appeals (p 5), *"the availability of a means to test truth seems significantly to distinguish this case from Bruton where there was no such availability of cross-examination or confrontation"* (emphasis supplied).

Furthermore, I cannot agree with the dissenter's pronouncement that the Court of Appeals' discussion in this regard was mere "obiter dictum". After mentioning that the *Stanbridge* case had been remanded by the Supreme Court for further consideration " 'in light of *Bruton v United States*' ", the Court of Appeals specifically stated (p 4) that the "decision in *Bruton turned entirely on the absence of confrontation of witnesses required by the Constitution in a criminal trial"* (emphasis

supplied). This State's highest court then discussed the issue of confrontation and specifically concluded (p 5) that *"[t]he complete absence of confrontation found in Bruton * * * did not exist here"* (emphasis supplied), because Stanbridge's attorney had a full opportunity in an adversary proceeding to examine the codefendants as to statements made by them involving Stanbridge. Obviously, therefore, the main thrust of the affirmance in *Stanbridge* was predicated upon the sufficient opportunity of that defendant's attorney to cross-examine the codefendants at the *Huntley* hearing.

Aside from the issue of confrontation, it is clear that the statements made by Safian and Miner, as a comparison of them will reveal, are essentially the same. This is graphically illustrated in the People's brief: "Both defendants stated that they met one night at the Roosevelt Bar. Safian indicated he saw Miner 'kick his car'; Miner indicated that he 'kicked his car a couple of times.' Safian stated that he told Miner he was, 'looking for some crazy guy to take care of this girl'; Miner stated that Safian told him 'he needed a job done on someone' ('knocked off'). Safian confessed that they agreed on a price after some negotiating ($1,000.00); Miner confessed that he told Safian that if he talked 'the right figures' he would 'do it.' Safian stated that he 'saw him one night in the Roosevelt Bar and showed him the house and the place where she worked, also her car'; Miner stated Safian told him to meet him at 'the Roosevelt Bar' and that he took him 'to where she lived,' 'to where she worked,' and he 'showed me the car.' Safian indicated that 'I left it up to him, first heard Friday night'; Miner indicated that he killed Deborah Safian on Friday night and that Safian 'would be at the Roosevelt Bar, Friday, Saturday and Sunday nights' to establish his alibi and to await Miner's call. Safian confessed that 'I figured he did it—stabbed her,' Miner confessed that Safian wanted to know if he 'could do it with a knife.' After describing the initial meeting, the planning, the timing, and the method and the accomplishment, both spoke of the pay off. Safian stated, 'He said to me to set up a meeting place to pay him'; Miner stated, 'I told him to get in touch through my friend, to pull into his gas station and walk inside * * * and hand him an envelope for me.' Clearly, the statements are one and the same."

The appellant's reliance on *People v Payne* (35 NY2d 22) is misplaced. In *Payne,* codefendant Streiff admitted only that, upon seeing the decedent drunk and unconscious in her car,

he assisted codefendants Davis and Payne in removing her to a secluded, wooded area, where they left her alone with Payne. However, in Payne's confession he stated that the others had helped tear her clothes off and then stood around while he lay down beside her in an attempt to commit rape, at which point they discovered she had stopped breathing. In ordering a new trial as to Streiff, the court stated that (p 29): "the codefendant's [Payne] statement cannot be dismissed as almost identical. Since Streiff's statement left some doubt as to whether rape had been attempted, his rights were substantially prejudiced when he was tried together with Payne who had previously admitted in dramatic and explicit terms that the underlying felony had in fact been committed."

In the instant case, it is manifest that both statements are cross-implicating and point to only one conclusion, namely that Safian hired Miner to kill his wife for the price of a motorcycle, and that Miner carried out his end of the bargain.

Accordingly, since both Miner and Safian confessed to the crime, since each implicated the other with strikingly similar confessions, and since Safian was afforded the opportunity to cross-examine Miner at the *Huntley* hearing, the court properly denied the motion for a severance. In addition, there were clear and forceful instructions by the court throughout the trial and during the charge to the jury that each confession should be considered only against the particular declarant.

The position advanced in the dissenting opinion, namely, that the denial of the motion for a severance was erroneous because the confessions were not essentially identical, has been discussed above. Mr. Justice SHAPIRO is not impressed by the fact that Safian had the opportunity to cross-examine Miner at the *Huntley* hearing. However, as noted previously, the Court of Appeals held in *People v Stanbridge* (26 NY2d 1, *supra)* that when a confessing codefendant testifies at a *Huntley* hearing, although he does not take the stand at the trial, the *Bruton* rule does not apply. In *Stanbridge,* the court reasoned that (p 5) "the availability of a means to test truth seems significantly to distinguish this case from *Bruton* where there was no such availability of cross-examination or confrontation."

### THE CHARGE

The appellant also assigns as error the Trial Judge's refusal, as per his request, to charge manslaughter (reckless homicide)

as a lesser included offense. Thus, he suggests that the "proof raised a reasonable and substantial question for the jury concerning the particular intent with which Mr. Safian acted in his dealings with Robert Miner. The jury could have reasonably inferred that, at best, Mr. Safian intended that his wife meet with serious injury, and not death." Thus, it is argued he only told Miner to "take care of" the victim, and did not expressly command Miner to commit murder; he chose a 16-year-old to perform the crime; he did not pay Miner; he was surprised at Miner's extreme measures; and he was concerned for his baby daughter. These factors, he claims, all fail to conclusively establish homicidal intent.

CPL 300.50 defines under what circumstances a court is authorized to submit another crime as a lesser included offense:

"1. In submitting a count of an indictment to the jury, the court in its discretion may, in addition to submitting the greatest offense which it is required to submit, submit in the alternative any lesser included offense if there is a reasonable view of the evidence which would support a finding that the defendant committed such lesser offense but did not commit the greater. If there is no reasonable view of the evidence which would support such a finding, the court may not submit such lesser offense. Any error respecting such submission, however, is waived by the defendant unless he objects thereto before the jury retires to deliberate.

"2. If the court is authorized by subdivision one to submit a lesser included offense and is requested by either party to do so, it must do so. In the absence of such a request, the court's failure to submit such offense does not constitute error."

In our opinion, the Trial Judge properly refused to charge as requested because *no* reasonable view of the evidence would support Safian's claim that he never intended to have his wife killed, but rather only intended that she be injured.

We feel that our dissenting brother is in error when he asserts that Safian's confession, "nowhere states that he hired Miner to kill his wife". On the contrary, Sergeant Small testified that while Safian was being booked shortly after he read and signed his statement, he asked Safian if "he felt better since he admitted his part in the killing of his wife", to which Safian replied that "he felt like the world was lifted from his shoulders." In view of this admission, the words "take care of" obviously meant that she should be done away

with. Thus, in the face of this admission alone, the court properly refused to charge manslaughter. In addition, as mentioned earlier, Safian, prior to giving the written statement, told Captain Norman that he had "wanted to get rid of a person".

Moreover, looking at the written statement itself, Safian admitted that he did not like the way his wife was treating their daughter. Merely hiring someone to beat her up would not have permanently removed his wife from exercising her influence over the child.

### THE PROSECUTOR'S SUMMATION

The dissenter argues that the following portion of the prosecutor's summation was "grossly prejudicial":

"Before I close here now, I would just like to mention one aspect here on the topic of liability and the contribution that concerns the acts as made by each of the parties, the defendants in this case.

"While they may have had a partnership to do a crime, the basic principles of that type partnership are not much different than any other business partnership. Statements made by or acts done by one partner are binding upon the other. And the same applies, that basic principal [sic], with the situation that we have concerning the facts and circumstances of Deborah Safian's death."

Although we agree with our brother that the prosecutor did improperly state the law, we do not feel that, taken alone, this portion of the summation was so prejudicial as to require a new trial.

Thus, as stated earlier, the court, on numerous occasions admonished the jury not to consider any statement made by one defendant as binding upon the other. Moreover, the court repeatedly instructed and reminded the jury during its charge that the statements were not to be considered against the individual who did not make them.

In view of the court's repeated warnings to the jury, and the overwhelming proof of guilt, we do not believe that the prosecutor's improper statement deprived Safian of a fair trial.

We have considered the other points raised by the appellant and have found them to be without merit.

SHAPIRO, J. (dissenting). I dissent and vote to reverse the judgment of conviction and order a new trial on the following three grounds:

(1) There should have been a severance of this defendant's trial from that of his codefendant, Miner (see *Bruton v United States,* 391 US 123; *People v Fisher,* 249 NY 419; *People v Payne,* 35 NY2d 22; *People v Bornholdt,* 33 NY2d 75).

*Bruton* taught us that it is a denial of a defendant's constitutional right to confront the witnesses against him when he is compelled to submit to a joint trial where his codefendant does not take the stand and the latter's confession implicates him in the commission of the crime. Here the codefendant Miner did not take the stand, but the People contend that *Bruton* does not apply because, under *People v McNeil* (24 NY2d 550), where the defendants make "almost identical" confessions the *Bruton* error may be disregarded. Assuming that to be so, a comparison of the two confessions clearly shows that on the main issue of whether it was intended that the deceased be killed, there is a substantial divergence between them. In the Miner confession he clearly states that he was hired by the appellant to kill the deceased and he goes into all of the gory details of the deal. The appellant's confession, on the contrary, nowhere states that he hired Miner to kill his wife (the deceased). Throughout, the language he uses is susceptible of involvement in a less nefarious plot. Under the circumstances, it is clear that even under the *McNeil* rule the appellant was entitled to a severance so that a jury could determine, unaided by the Miner confession, whether he ever really expected his wife to be murdered—an essential element of the crime with which he was charged (see Penal Law, § 125.25).

Furthermore, aside from the appellant's constitutional right to a severance under *Bruton* and *McNeil,* the case of *People v Payne (supra,* p 27) makes it clear that "the defendant's right to a separate trial is broader than his right to confrontation and may be found to exist even where the codefendant has remained completely silent both before and during trial". Here the totality of the proof, except for the appellant's confession, without which there would have been no triable issue against him, was directed against the codefendant, Miner. Under such circumstances the dissection of the proof by the jury—no matter how ably charged by the court—was

next to well nigh impossible (cf. *Roberts v Russell,* 392 US 293).

In reliance upon *People v Stanbridge* (26 NY2d 1), the majority states that the *Bruton* rule does not apply "where the confessing defendant testifies at a *Huntley* hearing, although not taking the stand at the trial", because there has been an opportunity for cross-examination.

I do not believe that to be a correct statement of the law, for while a defendant who testifies at a *Huntley* hearing "may be impeached by any of the recognized methods of impeachment", *"[h]e may not, however, be cross-examined as to the merits of the case* unless his testimony on direct examination makes such cross-examination relevant" (Richardson, Evidence [Prince, 10th ed], § 550, p 553 [emphasis supplied]; *People v Huntley,* 46 Misc 2d 209, affd 27 AD2d 904, affd 21 NY2d 659; *People v Lacy,* 25 AD2d 788). Furthermore, as Richardson states (§ 550, p 554): "It seems clear also that the testimony given by a defendant in support of his motion to suppress is not admissible against him at the main trial unless the defendant testifies at the trial" (see *People v Huntley,* 46 Misc 2d 209, 212-213, *supra; Harris v New York,* 401 US 222).

Here the defendant Miner did not testify at the trial, but his confession made him a silent witness against the appellant without any opportunity by the latter to prove the truth of the story related therein, or to explore the facts to qualify or discredit him.

The statement from *People v Stanbridge (supra)* upon which the majority relies was obiter dictum, and it seems clear, at least to me, that the main thrust of the affirmance in that case was predicated upon other grounds.[1]

But assuming that *Stanbridge,* correctly interpreted, stands, among other things, for the proposition that the constitutional right to confront witnesses has been provided where the

---

1. In *Stanbridge* the Court of Appeals said (p 5): "This court, considering the effect of *Bruton,* has noted the difference in effect where codefendants testify at the trial and are subject to cross-examination *(People v. Anthony,* 24 N Y 2d 696). It has applied the same rule where opportunity to cross-examine was afforded at a *Huntley* hearing *(People v. Galloway,* 24 N Y 2d 935)."

I have read the briefs in *People v Galloway (supra)* cited for the stated proposition, and find that in that case there was a redaction of the appellant's name in the introduced confession of his codefendant. In addition, in *Galloway,* two other principals in the commission of the crime testified fully as People's witnesses with regard to the same facts, so that the harmless error rule applied.

confessing codefendant has testified at his *Huntley* hearing, that is not the fact here as a reading of the hearing minutes reveals. In the first place the court dealt with the *Huntley* hearing of each defendant as a separate proceeding. Thus it said: "We will start off the testimony on the Miner hearing first and as you gentlemen know, as far as the Miner hearing goes, you, Mr. Keogh [appellant's counsel], of course, are an observer, *you cannot ask questions"* (emphasis supplied).

Again during the *Huntley* hearing, the court, in denying appellant's counsel the right to object to a question, stated that "the fact that the conversations were about him [Safian], you would not have any right on the *Huntley* hearing and this is no waiver, of course, of any position at the trial or anything else you wish to take." During the hearing as to Miner, the court turned over *Rosario* material to counsel for the said defendant, but not to counsel for the appellant, whom he had theretofore determined to be merely "an observer" at the proceedings. When the hearing as to Safian began the court determined that "there was no *Rosario* material to which the defendant is entitled", although *Rosario* material had previously, at the Miner hearing, been turned over to the latter's attorney.

When Miner took the stand at the *Huntley* hearing, counsel for the appellant attempted to interpose an objection and he was told by the court: "I don't think you have any standing to object * * * and, assuming for the sake of argument you had standing, I overrule the objection anyway." Thus, all through the testimony of Miner, both on direct and on the Assistant District Attorney's cross-examination, the "observer" Safian was immobilized—he could not object no matter what the nature of the questions was.

It was not until Miner had testified on direct and had been cross-examined by the Assistant District Attorney, and when no one had any further questions, that the court first indicated that it would permit Mr. Keogh—appellant's attorney— to cross-examine Miner "even though you are not part of the Miner hearing". After counsel stated that in view of the court's previous rulings denying him standing he was caught "completely by surprise", and after some further discussion of the applicable law, a recess was taken. When the proceedings resumed, counsel for Miner objected to any cross-examination of his client by Safian's counsel and stated that he would direct his client "not to answer any question Mr. Keogh might

put to him. That is the defendant Miner's position, in any event." After some further discussion, and after Mr. Keogh stated: "I can't cross-examine a defendant if he won't answer", the court indicated that within stated limitations it would permit cross-examination, would direct the defendant Miner to answer, and would not permit his counsel to direct him "not to answer any questions". It was after all of this—and after having been denied any right to participate in any way during the lengthy Miner hearing—that appellant's counsel, stating his reasons, declined to cross-examine Miner. Under the circumstances, who could blame him.

But getting away from that issue, the fact still remains that the purpose of the right to confront and cross-examine witnesses is to dispute the verity of what the witness has stated. Here, Miner had testified both on direct examination and on cross-examination that the confession was obtained from him in violation of his constitutional rights. Under such circumstances there was no real opportunity to test the *verity* of the confessions made by him as opposed to the manner in which they were obtained. The *Stanbridge* rule, therefore, in any event, giving it the full scope claimed for it by the majority, does not apply, for as this court said in *People v Oldring* (42 AD2d 737, 738): "Absent meaningful confrontation, the *Bruton* problem subsists" and the *Stanbridge* case "is not in point". Here, because the appellant was denied any right to participate all through the Miner hearing, there was not and could not have been any "meaningful confrontation". The court's belated change of mind could not undo the "observer" status forced upon appellant while all of the witnesses were testifying.

(2) In its refusal to charge the lesser included offense of manslaughter, the court committed basic prejudicial error.

What is a lesser included offense is defined by CPL 1.20 (subd 37): "When it is impossible to commit a particular crime without concomitantly committing, by the same conduct, another offense of lesser grade or degree, the latter is, with respect to the former, a 'lesser included offense.' " Manslaughter may, of course, be a lesser included offense of murder in the second degree. Such a lesser offense is to be charged "if there is a *reasonable view* of the evidence which would support a finding that the defendant committed such lesser offense but did not commit the greater" (CPL 300.50, subd 1; emphasis supplied).

Accepting that statutory definition at full value, and assuming that it has not been liberalized by the cases so as to mandate a charge of a lesser included offense when "upon *any* view of the facts, the defendant could properly be found guilty of the lesser crime" (see *People v Tai,* 39 NY2d 894, 895; emphasis supplied), it is nevertheless obvious in this case that the jury could have found upon a "reasonable view of the evidence" that the appellant intended that Miner should inflict serious bodily harm upon the deceased (which would be manslaughter under subdivision 1 of section 125.20 of the Penal Law, in view of her death), but not kill her (which would be murder under section 125.25 of the Penal Law). Under the circumstances, the appellant was entitled to the charge which he sought as to the lesser offense (see *People v Mussenden,* 308 NY 558; *People v Moran,* 246 NY 100; *People v Shuman,* 37 NY2d 302; *People v Stanfield,* 36 NY2d 467). In considering whether a charge as to a lesser offense should be given, the court must view the evidence in a light most favorable to the defendant to determine "[if] there is some basis in the evidence for finding the accused innocent of the higher crime, and yet guilty of the lower one" *(People v Mussenden, supra,* p 563). In attempting to get away from this rule the majority erroneously assumes that the jury was compelled to accept the testimony of Sergeant Small and Captain Norman. It could, of course, have refused it credence.

(3) In his summation the prosecutor said: "While * * * [Safian and Miner] may have had a partnership to do a crime, the basic principles of that type partnership are not much different than any other business partnership. Statements made by or acts done by one partner are binding upon the other. And the same applies, that basic principal *[sic],* with the situation that we have concerning the facts and circumstances of Deborah Safian's death."

It is clear, of course, that analogizing the facts here to a partnership and urging the jury to consider the "statements made by * * * one partner * * * [to be] binding upon the other", was an incorrect statement of the law. Since Miner's ex parte confession was extreme in its inculpatory involvement of the appellant, the statement was grossly prejudicial (cf. *People v Baker,* 23 NY2d 307, 318; *People v Adams,* 21 NY2d 397, 401-402).

The District Attorney (citing Richardson, Evidence [Prince, 10th ed], § 244) states in his brief that "such statements,

because they were made in the course of and in furtherance of the agreement to kill, were admissible against each defendant and binding on each defendant". That section of Richardson correctly states the law, but it has no application here for the statements (confessions) were not made in furtherance of the agreement to kill, but were ex parte statements given to the police after the nefarious deed had been accomplished. Under such circumstances, the statement of one actor in the play is never binding upon the other—unless, of course, it is adopted by him.[2]

In fusing the two confessions the District Attorney only exacerbated the *Bruton* error committed by the trial court in not ordering a severance.

In passing upon just such a summation by a prosecutor, the Court of Appeals in *People v Baker* (23 NY2d 307, 318, *supra)* said: "To compound the problem, the prosecutor urged the jury to consider Hamm's statement against all the defendants. This vitiated any instructions by the trial court *(People v. Adams,* 21 N Y 2d 397, 401; *People v. Lombard,* 4 A D 2d 666)."

The record makes it clear that the appellant is an unworthy specimen of humanity, but the Court of Appeals has repeatedly *"refused* 'to announce a doctrine that the fundamentals of a fair trial need not be respected if there is proof in the record to persuade us of defendant's guilt' " *(People v Adams,* 21 NY2d 397, 402).

Felix Frankfurter put it another way when he said: "A shocking crime puts law to its severest test". Affirmance here would flunk that test. There should be a reversal and a new trial.

MARGETT, J. P., and SUOZZI, J., concur with TITONE, J.;

---

2. The statement in Richardson is: "§ 244. Admissions by One of Several Conspirators. When a conspiracy has been established, the admissions of each co-conspirator made or done in the course and furtherance of the conspiracy are admissible against the others. To illustrate: Where a conspriacy in fraud of creditors between a debtor and his transferee has been proved, the acts and statements of either, in furtherance of the purpose to defraud, are competent against both parties. *Dewey v. Moyer,* 72 N. Y. 70, affd. 103 U. S. 301 * * * But the admissions of one conspirator, made after the common design has been accomplished or abandoned, are inadmissible against the others. *People v. Storrs,* 207 N.Y. 147 * * * *People v. Ryan,* 263 N.Y. 298 * * * *People v. Vaccaro,* 288 N.Y. 170 * * * *People v. Marshall,* 306 N.Y. 223 * * * The declarations of an alleged conspirator cannot be received for the purpose of proving the conspiracy. *Cuyler v. McCartney,* 40 N. Y. 221; *Lent v. Shear,* 160 N.Y. 462."

SHAPIRO, J., dissents and votes to reverse the judgment and order a new trial, with an opinion.

Judgment of the Supreme Court, Westchester County, rendered January 6, 1976, affirmed.

