Fuchsberg, J.
(concurring as to Miner and dissenting as to Safian). The majority ignores the principle, so simply and forcefully put by the late Justice Hugo Black, that "[b]ad men, like good men, are entitled to be tried and sentenced in accordance with law” (Green v United States, 365 US 301, 309). As we read the record, David Safian, like him or not, did not get a fair trial. When that happens to anyone in our society, the rights of all are diminished. Therefore, though the entire court agrees that Robert Miner’s conviction of murder should stand, my fellow dissenters and I believe Safian is entitled to a new trial.
Inescapable prejudice to Safian was bound to flow from the impermissible introduction of Miner’s statement, which, because Miner did not testify, was not subject to the test of cross-examination. Contrary to the self-proving premise that animates the majority’s opinion, Safian’s own confession raised an important and reasonable question for the jury as to whether Safian intended that the plot against his wife have fatal or nonfatal consequences. Either inference was possible and it was for the jury to decide which one to draw. Safian’s defense to the murder charge, in fact, was premised on the contention that he lacked any intent to kill and, consistent with that position, his counsel requested a charge on the lesser charge of manslaughter. But the prosecution’s use of the Miner statement was calculated to, and apparently did, condition the minds of the jurors to accept the idea that Safian planned the killing. This was error of constitutional magnitude.
Because the majority’s exegesis of Safian’s confession is so conclusory, we preface our analysis by setting forth the heart of both confessions as summarized by the Appellate Division. Safian’s confession is presented first (59 AD2d, at pp 23-24):
"Miner met Safian at the bar. According to Safian, the following ensued: 'Then I told him I was looking for some crazy guy to take care of this girl I know. He told me he was crazy and could use money to buy a motorcycle and I told him I would talk to him. He said, "How much?” ’. After a brief bargaining session, the parties agreed on a figure of $1,000. Safian, on a subsequent night, showed Miner her home and where she worked, and 'left it up to him’.
*192 "After Safian heard about the killing, Miner met him at the bar and said that '[h]e didn’t mean to do it that way. I told him he was crazy, he was sick. I don’t know, maybe the way he did it’.
"Safian went on to explain: 'A couple of times he came into the Roosevelt Bar. When I realized how it was done I figured he did it, stabbed her. * * * He said to me to set up a meeting place to pay him. * * * I had money set aside at home, but not for him, just money saved. When I was talking to him you say these things. I never expected him to do it. Well, the reason it came into my mind to do it is that I felt that she was trying to put the children aside to better herself.’ ”
Miner’s lengthy and far more encompassing confession was described as follows (59 AD2d, at pp 22-23):
"Safian mentioned to Miner that he (Safian) 'needed a job done on a couple of people’ and that 'he needs two people knocked off, one of the persons he was thinking of doing himself and the other he said he couldn’t do himself as he needed a solid alibi which I found out later he needed the alibi as it was his wife.’
"The following week Safian again saw Miner and said he needed the job done. To this Miner replied: 'you get me a piece, talk the right figures and give me some information and I will do it.’ A week later Miner agreed to use a knife after being informed by Safian that he could not get a 'piece’. A couple of nights later Safian pointed out where the intended victim lived and also where she worked as a waitress on weekends (Cooky’s Steak Pub in Yonkers). He also informed Miner that she finished work between 11:30 p.m. and 3 a.m., pointed out her car and gave Miner a brief description of her general appearance. Safian also said that he would be at the Roosevelt Bar and Grill on weekend nights between 10 p.m. and 3 a.m. 'until it’s done’, so that he would have an alibi.
"On Friday, May 2, 1975, at about 11:30 p.m., Miner stopped his motorbike behind the victim’s car as she was getting out and asked her directions to Central Avenue. As she was writing out the directions, Miner took out his knife. When she saw the weapon, she started to run; however, Miner caught her and stabbed her about 19 or 25 times. The victim screamed several times and then went limp. When Miner, heard someone yelling, he ran to his bike and 'split’.
"Some days thereafter, Miner saw Safian at the bar, but *193 pretended not to know him. Safian left and Miner followed five minutes later. Miner complained that 'you should have told me it was your wife’. Safian said he would be in touch and Miner suggested he get in touch through a friend. Although the two met a couple of times thereafter at the bar, Safian refused to give Miner any money because 'the cops were really coming down on him’.”
Juxtaposing both confessions, critical differences emerge.
Specifically, nowhere does Safian’s statement unambiguously indicate that Safian intended to have his wife murdered. In fact, as to the element of intent, though the indictment charged him with aiding and soliciting in the commission of murder (Penal Law, § 20.00), Safian’s confession is couched in vague phrases not necessarily more consistent with intent to murder than with intent to inflict nonfatal or perhaps nonphysical injury. The majority, concentrating on the many points on which both confessions dovetail, persistently ignores the crucial gap and bridges it by inferring the missing scienter element. Although a jury could have so interpreted portions of his confession, our only concern should be whether, absent Miner’s confession, Safian’s conviction for second degree murder was compelled beyond a reasonable doubt (People v Crimmins, 36 NY2d 230, 237). On that score, viewed objectively, while it does not present a pretty picture, it cannot be said that the evidence rules out the lesser charge of first degree manslaughter as a matter of law.
In contradistinction, Miner’s confession damns Safian. It details a plot inspired by Safian, though executed by Miner, to have Safian’s wife murdered. The references to be found in Miner’s statement alone, regarding having someone "knocked off” and an initial willingness on Safian’s part to procure a "piece”, completely rebut any inference that Safian could have reasonably intended Miner’s acts to result in other than death. Furthermore, a statement Miner made to a girl friend that he was to be paid for committing a homicide was also admitted. This, too, contributed to establishing Safian’s intent in the jury’s eyes.
The majority nevertheless struggles to fit this case within the confines of the exception to the Bruton rule that holds harmless the introduction of a codefendant’s confession when the other defendant himself has made an "almost identical” confession. (People v McNeil, 24 NY2d 550, 552). True, after making allowance for inevitable differences in such things as *194 style and nuance, the test of harmlessness has been said to be whether there is substantial identity between the confessions on all elements of the crime (United States ex rel. Ortiz v Fritz, 476 F2d 37, 40). However, in Safian’s case, as we have seen, the gap between the potentials for conviction and acquittal, at least on the element of intent as a component of murder, was impermissibly narrowed by the additional data supplied in the Miner statement. Far from being inconsequential, the Miner confession was precisely the type of "powerfully incriminating extrajudicial statement” that Bruton was designed to guard against (see 391 US 123, 135-136). In short, this was not a case of "[c]ast our [Miner’s] confession and the result would need to be the same” (People v Fisher, 249 NY 419, 426).
Nor may the divergence between the two confessions be viewed as though it were purely a matter of semantics. Safian’s assertion that Miner either mistook or exceeded Safian’s plan is no more disingenuous than Henry II’s impassioned claim that his rhetorical plea to be rid of Becket was misconstrued by his knights as a command to murder. Similarly, the jury could have viewed Safian’s role, untainted by Miner’s confession, as "susceptible of involvement in a less nefarious plot” than that which the People choose to infer (59 AD2d 20, 32, supra, dissenting opn of Shapiro, J.).
Put another way, rather than two substantially identical confessions, Miner’s is the key with which Safian’s ambiguities are unlocked. At the very least, Miner’s version of the facts brings sharply into focus what Safian’s confession leaves unclear. Here there was no harmless variation in detail but a disparity on the fundamental mens rea issue, a disparity which Miner’s confession, though inadmissible hearsay as against Safian, could well have overcome to establish a crucial element of the State’s case on the second degree murder charge. To paraphrase Judge Cardozo, until Miner’s statement is considered, this was a case of which it could be said, "[o]nly half of the problem * * * has been solved * * * There remains the question of the nature of his offense”. (People v Galbo, 218 NY 283, 290.)
But no matter that the majority blinds itself to the Bruton violation here, it also ignores a related and important body of our own State’s decisional law that holds as error the denial of a severance in these circumstances. Like Bruton, the basis for this rule ultimately rests on the right of every defendant
*195 to have the jury assess his guilt or innocence solely on the basis of the evidence constitutionally admissible against him. Thus, in People v Fisher (supra, p 427) we stated that the denial of a severance was an abuse of discretion whenever, "without the existence of a confession by one defendant, the evidence against another would be too weak to justify a conviction or even [render] a conviction * * * doubtful”. Ergo, when there exists a substantial risk that a codefendant’s confession provides the critical element in the prosecution’s case against the defendant, his right to a separate trial must be respected (People v Payne, 35 NY2d 22, 28; People v Feolo, 282 NY 276, 278-282).
In People v Payne (supra), we confronted circumstances not unlike those before us now. There, each of the three codefendants signed a statement admitting some degree of involvement and implicating the others in murder and attempted rape. The greatest disparity existed between the statements of Payne, whose confession incriminated everyne in the attempted rape, and those of his codefendant Streiff, who confessed only to helping abduct the woman and then leaving her alone with Payne. All three were tried jointly. Although each defendant took the stand, we found the denial of a severance as to Streiff reversible error, despite the availability of cross-examination, because Payne’s statement, clearly inadmissible against his fellow defendant, served as a "guide for resolving ambiguities in the People’s case against” Streiff. (People v Payne, supra, p 28.)
Under this exacting standard, a fortiori, in the present case, the denial of Safian’s motion for severance cannot be held harmless. Despite his obvious involvement in the death of his wife, without Miner’s account, Safian’s conviction for murder is rendered far less certain. And a court should not presume what a jury might or might not have concluded had Miner’s confession not been introduced (see People v Rossi, 270 App Div 624, 628-629). For, this is one of those "close cases in which the inculpatory remarks might have been the deciding factor in the juror’s minds even though the state had an otherwise strong case” (Note, 46 Temple LQ 111, 115; see People v McNeil, 24 NY2d 550, 556, supra, dissenting opn of Fuld, J.).
Additionally, the patently prejudicial impact of Miner’s confession was rendered all the more devastating by two other trial errors. Notwithstanding that the evidence properly ad *196 missible against Safian was sufficient to warrant submission of the charge on the lesser included offense of manslaughter in the first degree (see People v Henderson, 41 NY2d 233, 236), the requested charge was denied, leaving Safian with the all- or-nothing alternative of conviction on the murder charge alone. Also exacerbating the effect of Miner’s hearsay statements was the misstatement by the prosecutor, in his summation, that the defendants were "partners” and that "[statements made by or acts done by one partner are binding upon the other.” Such argument has been held to be prejudicial error that vitiates the instructions given by the trial court to the contrary (People v Adams, 21 NY2d 397, 401-402).
For all these reasons, we would reverse the order of the Appellate Division and grant a new trial as to Safian and affirm the order as to Miner.
Judges Jasen, Gabrielli and Jones concur with Chief Judge Breitel; Judge Fuchsberg dissents and votes to reverse in a separate opinion in which Judges Wachtler and Cooke concur.
In People v Safian: Order affirmed.
Judges Jasen, Gabrielli and Jones concur with Chief Judge Breitel; Judge Fuchsberg concurs in a separate opinion in which Judges Wachtler and Cooke concur.
In People v Miner: Order affirmed.